# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

CHARLENE J. MCMAHON,

     Plaintiff,

     v.                          Case No. 04-C-384

CARROLL COLLEGE,

     Defendant.

## DECISION AND ORDER

### NATURE OF CASE

On December 10, 2003, plaintiff Charlene J. McMahon filed this action in the Western District of Wisconsin. Subsequently, the plaintiff filed an amended complaint and the venue was transferred to this court. The plaintiff alleges that the defendant discriminated against her on the basis of sex and pregnancy in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq,. The plaintiff also alleges that the defendant retaliated against her on the basis of her sex in violation of Title VII and Title IX. Additionally, the plaintiff alleges state law claims of breach of contract and retaliation / breach of contract. By Decision and Order filed January 18, 2005, the court granted the defendant's motion for judgment on the pleadings and dismissed the plaintiff's Title IX claims.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was

assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

The defendant filed a motion for summary judgment (Docket # 89). The motion is fully briefed and will be addressed herein.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). All inferences are taken in the light most favorable to the non-moving party. Matter of Wade, 969 F.2d 241, 247 (7th Cir. 1992). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party

- 2 -

retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324. "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322 (emphasis added).

Evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT&T Communications, Inc., 972 F. 2d 845, 849 [7th Cir. 1992]; Fed. R. Civ. P. 56 [e]).

"It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact. Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) (citing Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719,, 724 [7th Cir. 1998]). An affidavit laden with conclusory legal statements and barren of any relevant facts of which the affiant had personal knowledge is not proper under Rule 56(e). See Resolution Trust Corporation v. Juergens, 965 F.2d 149, 152-53 (7th Cir. 1992). Furthermore, a party may not create an issue of fact with an affidavit containing conclusions that contradict depositions or other sworn testimony. F.T.C. v. Bay Area Business Council, Inc., 423 F.3d 627 (7th Cir. 2005); Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005).

Proposed findings of fact which are based on hearsay are not included in the relevant facts set forth in this decision. See Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Arguments have no place in proposed findings of fact or

responses to such findings.  See Civil Local Rule 56.2 (E.D. Wis.).  Therefore, any such

"finding" has not been included in the undisputed findings of fact.  Proposed factual findings

which lack evidentiary support and responses to any such findings lacking evidentiary support

do not create a triable issue of fact.  Accordingly, any such findings have not been included

in the relevant undisputed facts.  Finally, some of the citations to the record in this case do not

support the particular proposed findings of fact.  These proposed findings of fact either have

not been included in the relevant facts or, if readily possible, have been modified to accurately

reflect the stated evidence.

### MOTION FOR SUMMARY JUDGMENT
### RELEVANT UNDISPUTED FACTS[1]

**A.    THE PARTIES**

Plaintiff Charlene J. McMahon is an adult citizen of the State of Wisconsin, who

currently resides at 703 Lincoln Avenue, Waukesha, Wisconsin 53186.  In November 1999,

the plaintiff and her husband, Kevin McMahon, applied for faculty positions in the College's

Department of Chemistry.  The plaintiff accepted the offer to join the college's faculty, as an

assistant professor of chemistry.  Her tenure track appointment was subject to the "Conditions

of Employment at Carroll College."

Carroll College (College) is a private, not-for-profit college which was established in

1846 and is located at 100 North East Avenue in Waukesha, Wisconsin 53186.  The College

has adopted a mission of "provid[ing] a superior educational opportunity for [its] students, one

grounded in the liberal arts tradition and focused on career preparation and lifelong learning."

---

[1]As a general matter, unless accompanied by citation, the relevant facts are taken from the parties' proposed findings of fact which are not disputed.  Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

## B.  GOVERNANCE AT CARROLL COLLEGE

The power and authority to direct and prescribe the course of study and the discipline of the College is vested with the College's Board of Trustees.  The Board has stated that it works to "foster the long-term interests of the College," and the Board has identified the "overall direction of the College," "fiduciary responsibilities," and the "evaluation of the effectiveness of the operation of the College" as Trustee responsibilities.

The Board of Trustees elects a President to serve at the pleasure of the Board as the College's chief executive officer.  The President, in turn, has the authority to appoint senior officers in the administration of the College, such as the vice president of academic affairs. At all relevant times, the President of Carroll College was Frank Falcone.  He was hired by the College as president in 1993.  Although the College's Board can and does delegate much of its authority, "it can never delegate its ultimate responsibility for holding the objectives as well as the resources of the College in trust." (Declaration of Frank Falcone, Ph.D. [Falcone Decl.], Exh. C, Governance at Carroll College at 3).

At all relevant times, the Vice President of Academic Affairs of the college was Lynne Bernier.  During the relevant time period, her position also has been referred to as the Chief Academic Officer (CAO), Dean, Vice President, and/or Provost.

The Tenure and Promotion Committee is a consultative committee comprised of five tenured faculty members, which has the responsibility of recommending to the College's administration those members of the teaching faculty who merit an award of tenure.  The Faculty Executive Committee (FEC) is a constituent committee comprised of faculty that serves as a communication medium between the faculty and the College's administration.

- 5 -

During all relevant times, Robert Black was a faculty member at the College and the Chair of the College's Tenure and Promotion Committee. Dr. Black previously held a position in the College's administration as Vice President of Academic Affairs and the Dean of Faculty. At all relevant times, Lori Kelly sat on the Tenure and Promotion Committee.

Peter Settle is also a faculty member at the College, and during the 2002-2003 academic year, he served as the Faculty and Assembly President and the Chair of the Faculty Executive Committee. At all relevant times, Dr. Settle also served as a member of the College's Tenure and Promotion Committee. At all relevant times, Gary Stevens was a member of the Faculty Executive Committee. He succeeded Dr. Settle as the Faculty and Assembly President in the fall of 2003. Dr. Stevens had served as the College's Provost for a time period in the early 1990s.

As a faculty member, John Symms has served on the College's Faculty Executive Committee and its Governance Task Force. In the 2001-2002 time frame, Dr. Symms also held an appointment as Associate Dean and worked as an assistant to Dr. Bernier.

At the August 28, 2000, meeting of the Academic Committee of the Board, President Falcone announced Lynne Bernier's appointment as vice-president for academic affairs. At the meeting, Dr. Bernier introduced the draft of the Academic Affairs Annual Report and Goals. One of the goals for 2000-2001 was to "fill tenure-track positions through national searches" and to act upon faculty recommendations concerning tenure-track faculty staffing and any changes to tenure staffing policy. (Affidavit of Michael Fox [Fox Aff.], Exh. 17, Minutes of Academic Committee Meeting of August 28, 2000, and attachment).

At relevant times, a significant portion of the College's faculty disagreed with various decisions of the College's administration and/or Board. In 2003, the faculty voted "no

- 6 -

confidence" in President Falcone and later, "no confidence" in Board Chair Thomas Badciong. One of the factors motivating the "no confidence" votes was faculty dissatisfaction with the decision to deny tenure to four out of six candidates in February, 2003.

## C.    THE TENURE PROCESS AT CARROLL COLLEGE

"Academic tenure means the contingent report of a faculty member appointed to a tenure position to retain that position until retirement." (Falcone Decl., Exh. E, Conditions of Employment at Carroll College [Conditions of Employment], § III.A). The services of a tenured faculty member may be terminated for "adequate cause." Causes recognized as adequate are set forth in conditions of employment at Carroll College. Id. at § III.D. An award of tenure can represent an investment of over $2 million in salary and benefits in the individual faculty member over his or her career. (Deposition of Frank Falcone, Ph.D. [Falcone Dep.] at 74). Because of the significant commitment that tenure entails (financial and otherwise), educational institutions typically award tenure only after a faculty member has gone through a multi-year probationary period and a detailed tenure review process. The College maintains a tenure system.

The terms and conditions of employment for tenured and tenure-track faculty are set forth in a contract between the faculty and the Board of Trustees entitled, "Conditions of Employment at Carroll College." The Conditions of Employment are part of the College's Faculty Manual, a document that also contains the College's Articles of Incorporation, its By-Laws, and its governance document and other documents.

Section III of the Conditions of Employment provides as follows:

Academic tenure means the contingent right of a faculty member appointed to a tenure position to retain that position until retirement. . .. The faculty member having attained tenure status may continue to serve unless adequate cause

- 7 -

(See III-D) as shown for termination of employment."  (Falcone Decl., Exh. E, Conditions of Employment, § III A).

A grant of tenure is further characterized as "a formal personnel action of the Board of Trustees acting on recommendations from the President of the College, who, in turn, will have reviewed and acted upon the recommendation of the [Chief Academic Officer] and of the Tenure and Promotion Committee."  Id.

The Conditions of Employment further state:

Tenure is not automatically granted at the end of any stated probationary period except in accordance with Sections I-C and I-D.  The procedures set forth herein are designed not only to make a decision mandatory at a specific time but also to insure a deliberate judgment based upon the needs of the instructional program of the College and a candidate's potential for contributing to those needs.

Id.

The Conditions of Employment state:  "Every effort will be made during the probationary period by the chair, CAD and Tenure and Promotion to keep the faculty member informed of the prospects for a successful decision for appointment with tenure."  (Falcone Decl., Exh. E), Conditions of Employment, § III.B.2.a).  "The precise terms and conditions of each faculty appointment should be stated in writing and be in the possession of the college and faculty member before the appointment is consummated."  (Falcone Decl., Exh. E, Conditions of Employment § 1A).

Dr. Black, the Chair of the Tenure and Promotion Committee, testified that the Conditions of Employment give no assurance that a candidate in the tenure process will be granted tenure.  Even a candidate recommended for tenure has no right to tenure.  As acknowledged by Dr. Settle, the President of the Faculty Executive Committee in the 2002-

- 8 -

2003 academic year and the former Chair of the Tenure and Promotion Committee, the College never guarantees tenure to tenure candidates.

The Conditions of Employment require that the College must make a decision on tenure no later than the faculty member's sixth year of full time employment, although a decision may be made before that time, depending on the specific terms of the faculty member's appointment. The Conditions of Employment set up procedures that "are designed not only to make a decision mandatory at a specific time but also to insure a deliberate judgment based upon the needs of the instructional program of the College and a candidate's potential for contributing to those needs." (Stipulated).

The College evaluates tenured and tenure-track faculty members on achievement as reported in annual achievement, goals, and evaluation reports (AGER). Each tenure-track faculty member provides evidence in his or her AGER of achievement and future goals in three areas: effective teaching, professional and scholarly activity, and other service. The faculty member first submits to the department chair the completed achievement and goals section of the AGER, addressing the three merit criteria and containing a statement of goals for the following years.

The department chair then discusses the achievements and goals with the faculty member and completes an evaluation section addressing the three criteria and the statement of goals. The Dean of the Faculty then evaluates the recommendations of the department chair and attempts to arrive at a mutually agreeable statement of evaluation. The AGER and the statement of evaluation of the Dean and the department chair supplement the faculty member's master personnel file.

- 9 -

The College's Conditions of Employment require that a tenure applicant notify his or her department chair by September 15 of the desire to be considered for tenure. Under the Conditions, the tenure application process begins when the candidate's department chair nominates the candidate in writing to the Tenure and Promotion Committee. The candidate, with the assistance of the chairperson, prepares a dossier of material to support the achievement of the individual merit criteria for tenure, i.e., effective teaching, professional and scholarly activity, service. The candidate's chairperson then provides a letter of recommendation for the candidate. The candidate transmits the dossier to the Chief Academic Officer no later than October 15 of the same academic year and the contents of the dossier is transmitted to the Tenure and Promotion Committee no later than October 20.

The Tenure and Promotion Committee, with the Dean participating as an *ex officio* member, then conducts a thorough evaluation of each non-tenured tenure-track faculty member. The Tenure and Promotion Committee bases its evaluation primarily on the candidate's annual "Achievement Goals and Evaluation Reports (AGER), the chair's recommendation and the supporting evidence in the faculty member's master personnel file. (Falcone Decl., Exh. E, Conditions of Employment, § II.A.7). "All evaluation, recommendations and decisions are, necessarily, judgments of evaluators based on reasonable interpretation of available information." Id., § II.

The Tenure and Promotion Committee holds a hearing, at which the candidate has the opportunity to present additional evidence on his/her own behalf, subject to Committee questioning. At the end of its evaluation, the Tenure and Promotion Committee prepares a recommendation on tenure and promotion.

- 10 -

In reaching this recommendation, the Tenure and Promotion Committee considers the criteria of individual merit, i.e., effective teaching, professional and scholarly activity and service, not the question of need. This Committee forwards its own recommendations together with those of the department chair to the Chief Academic Officer. The Chief Academic Officer reviews these recommendations, but is not bound by them.

At the conclusion of the Tenure and Promotion Committee's evaluations, the Dean provides the candidates and the chair with a written assessment of progress towards tenure and outlines the primary objectives to be realized if the faculty member is to remain a viable candidate for tenure.

The Chief Academic Officer reviews the recommendations of the Tenure and Promotion Committee, the department chair and "determines at this time in tenure cases whether there is a continuing need for the candidate's service." (Falcone Aff., Exh. E, Conditions of Employment, § IV.B.4). The Chief Academic Officer makes her own recommendations by December 7 and forwards all recommendations to the President.

The President reviews the recommendations provided by the CAO, but is not bound by them. The President "reviews the findings and evidence, seeks such additional evidence as s/he deems necessary, and then refers the recommendations together with his/her own to the Academic Committee of the Board of Trustees." (Falcone Decl., Exh. E, Conditions of Employment, § VI B.5). After receiving the President's recommendation, the Academic Committee makes a recommendation to the full Board, which makes the final decision on tenure. The Academic Committee is not bound to follow any of the prior recommendations, nor is the Board.

- 11 -

The Board of Trustees grants tenure to a faculty member "acting on the recommendations of the President of the College, who, in turn, will have reviewed and acted upon the recommendation of the CAO and of the Tenure and Promotion Committee." (Falcone Aff., Exh. E, Conditions of Employment, § IIIA).[2] The Conditions of Employment further state: "The procedures set forth herein are designed not only to make a decision mandatory at a specific time, but also to insure a deliberate judgment based on the needs of the instructional program of the College and a candidate's potential for contributing to those needs." Id. If the Tenure and Promotion Committee recommends against tenure, the Dean informs the faculty member in writing.

On individual merit, Section II of the Conditions of Employment sets forth the following criteria on which a tenure-track faculty member's merit is evaluated: (1) effective teaching; (2) professional and scholarly activity; (3) and other service to the College, the profession, and the public. Under the procedures set forth in Section II, a faculty member's achievement and goals with respect to these merit criteria are evaluated annually by their Chairperson and the Chief Academic Officer through "Achievement, Goals, and Evaluation Reports" (AGERs). Non-tenured tenure-track faculty also undergo a biennial review by the faculty Tenure and Promotion Committee. As part of this biennial review, the faculty member is provided with an assessment on his or her progress toward tenure.

Dr. Dresang stated that, periodically, colleges and universities throughout the United States have considered the issue of "tenure density." He stated that he is aware of situations in which colleges and universities have intentionally hired non-tenure-track faculty in order to

---

[2] Both parties miscite the section of the document.

- 12 -

avoid filling all tenure slots in a particular department. Dr. Dresang testified that one strategic solution that colleges have employed in order to deal with tenure density issues is to allow attrition to "clear up" tenure slots, in order to preserve some "open" tenure slots. (Deposition of Dennis Dresang [Dresang Dep.] at 169).

The United States Department of Labor, Bureau of Labor Statistics has reported that "[t]he number of tenure-track positions is expected to decline as institutions seek flexibility in dealing with financial matters and changing student interests. Institutions will rely more heavily on limited term contracts and part-time, or adjunct, faculty, thus shrinking the total pool of tenured faculty." (Deposition of Kevin Schutz [Schutz Dep.], Exh. 11.).

## D. THE PLAINTIFF'S FACULTY APPOINTMENT IN THE CHEMISTRY DEPARTMENT

In 1999, the College's Chemistry Department consisted of four full-time tenure-track lines occupied by four men: Dr. Bud Hudson, Dr. Richard Watkins, Dr. Thomas Jones, and Dr. Michael Schuder. Dr. Schuder, an Associate Professor of Chemistry, taught in both the Chemistry and Physics Departments. In November 1999, the plaintiff and her husband, Kevin McMahon, both of whom are chemists, applied for faculty appointments in the College's Department of Chemistry. The plaintiff submitted her application to the College for the nationally advertised full-time tenure-track position requiring a Ph.D. in biochemistry. She had earned a bachelors degree in ACS Chemistry from Concordia College, Moorehead, Minnesota, in 1987 and a Ph.D. in chemistry from the University of Minnesota, Minneapolis, Minnesota, in 1996.

The plaintiff and her husband were recruited on December 12-14, 1999, and interviewed by Dr. Schuder, then the chairman of the College's Department of Chemistry. On

- 13 -

January 11, 2000, President Falcone, acting on behalf of the College, offered both the plaintiff and her husband appointments as assistant professors of chemistry on the tenure-track for the 2000-2001 academic year. "This letter represents a formal offer of employment effective September 1, 2000. As was discussed, this is a tenure track position." (Fox Aff., Exh. 12, Letter from President Falcone dated January 11, 2000). The plaintiff accepted the offer by her signature dated January 16, 2000.

In an April 3, 2000, report from the College's Strategic Directions Task Force, biochemistry was mentioned as a potential new program/major because it (1) built on the strengths of the College; (2) remained within a growing profession; (3) attracted quality students and will lead to good jobs; and (4) could be started at minimal to moderate cost.

On May 15, 2000, Dr. Bernier, acting in her capacity as Academic Advisor, provided the Chemistry Department with its goals for the 2000-2001 academic year. These goals included increasing the department's role in teaching non-majors and creating new emphases within the major.

The plaintiff and her husband accepted their respective offers of employment, and they began employment at the College effective September 30, 2000. As of September 30, 2000, Carroll College had four full-time faculty members in its Chemistry Department: Dr. Schuder, the plaintiff, Dr. Kevin McMahon, and Dr. Joseph Piatt.

The plaintiff's subspecialties under the field of chemistry are biochemistry and inorganic chemistry. She taught basic chemistry and biochemistry courses. She was the only member of the Chemistry Department qualified to teach courses in chemistry and biochemistry, in addition to courses in the health sciences programs.

- 14 -

Dr. Kevin McMahon, who specializes in organic chemistry, taught organic chemistry and forensic science courses. Dr. Piatt held a joint appointment in the Departments of Chemistry and Environmental Science and taught in both areas. As of September 30, 2000, Dr. Schuder had tenure. The plaintiff, Dr. Kevin McMahon, and Dr. Piatt, in contrast, were in the probationary periods of their tenure-track appointments.

The College advised the plaintiff at the time of her hire that her probationary period would last four years. The plaintiff had three previous years of teaching experience at a University in Abilene, Texas. The plaintiff understood that that she would remain a probationary employee until she went up for tenure. As a probationary employee, the plaintiff received a series of one-year appointments. Specifically, after her initial appointment for the 2000-2001 academic year, the College reappointed the plaintiff to her probationary, tenure-track position for the 2001-2002 and 2002-2003 academic years.

The plaintiff recognized that during her probationary period, she had no guarantee of continued employment. The College never represented to the plaintiff that she would or would not be awarded tenure.

In accordance with the College's expressed strategy as well as her department's stated goals as directed by Dr. Bernier, the plaintiff created and implemented a new biochemistry major during her first year of teaching. The process of promoting and guiding a new major at the College though the committee review process can be extremely difficult.

At a December 8, 2000, meeting, President Falcone informed the Executive Committee that it was financially viable for Carroll to plan its own nursing program and stated that "there are no nursing programs west of Milwaukee, demonstrating the need in our area." (Fox Aff., Exh. 18, Minutes of the Executive Committee of the Board dated December 8, 2000).

- 15 -

On December 20, 2000, President Falcone informed the plaintiff that she would receive a standard raise in lieu of a merit increase because it was her first year of employment. On February 9, 2001, in recommending the plaintiff for re-appointment to Dr. Bernier, Dr. Schuder wrote: "Charlene has already made great contributions to the chem. department. Her efforts to generate a biochemistry major will benefit the department and the College for many years." (Fox Aff., Exh. 20, Memo from Dr. Michael Schuder to Dr. Lynn Bernier dated Feb. 6, 2001).

The plaintiff was reappointed to the position of Assistant Professor of Chemistry for the period September 1, 2001, through May 31, 2002. In evaluating the plaintiff pursuant to the plaintiff's 2001 AGER process, Dr. Bernier identified the Chemistry Department's Goals for 2001-2002, including full implementation of the biochemistry major and assistance with the renovation plans for the department.

Dr. Schuder stated in the plaintiff's 2000-2001 evaluation that the plaintiff's goals "will be in the development of a new advanced biochemistry course that will serve biochemistry, biology and chemistry majors . . . The rest of us will try to keep up." (Fox Aff., Exh. 15, Plaintiff's Faculty Merit Evaluation Tabulation Sheet at 8 [unnumbered]). On July 12, 2001, President Falcone informed the plaintiff of a merit bonus awarded to her based on her service to the College during the year.

**E.   THE COLLEGE'S DECISION NOT TO "TENURE IN" THE CHEMISTRY DEPARTMENT**

Compared to its private sister colleges and universities, Carroll College has a low endowment of approximately $30 million. (Deposition of Dr. Robert Black [Black Dep.] at 94). The College's budget is tuition-driven and tuition-centered. As a result of the College's small endowment and its dependency upon tuition for revenue, a downturn in enrollment can render

- 16 -

the institution unable to meet its budget. Recognizing this dynamic, since Dr. Falcone became President in 1993, the College has changed and added to its academic programs in order to attract students.

As enrollment trends have shown a movement away from traditional liberal arts, the College has shifted from a traditional liberal arts format toward becoming a comprehensive college with liberal arts, professional, and pre-professional programs. The administration has assigned great importance to program diversification and staffing flexibility as a means of responding to changing enrollments and changing student preferences. An award of tenure represents the most significant personnel and budgetary commitment made by the College.

Each academic department at the College has allotted to it a certain number of tenure lines, of which the Chemistry Department has four. As of 2001, the four full-time faculty members working in the Chemistry Department either had tenure (Dr. Schuder) or held tenure-track positions (the plaintiff, Dr. Kevin McMahon, Dr. Piatt). Kevin McMahon was scheduled to present himself for tenure review in the fall of 2002, and the plaintiff and Dr. Piatt were scheduled to submit their application for tenure consideration in the fall of 2003. An award of tenure to all three of these faculty members would have resulted in a "tenured-in" department, i.e., each of the full-time tenure-track positions assigned to the department would have been filled with a tenured faculty member. In 2001, President Falcone examined the advisability of a "tenured-in" Chemistry Department.

Although enrollment in the College's chemistry courses had increased between 2000 and 2002, President Falcone considered this trend to be linked closely to increased enrollment in the College's health-related professional programs, such as nursing. Specifically, the Chemistry Department offered "service courses" (introductory-level, prerequisite classes) to

- 17 -

students enrolled in health-related professional programs. (Falcone Dep. at 35.) As enrollment in the health-related professional programs increased, so too did demand for the service courses in the Chemistry Department. Introductory-level courses within the Chemistry Department tended to be the largest classes among the department's course offerings. As of 2001, the demand for the college's health sciences programs was strong, and the College had no indication that this demand would fall off in the immediate future.

President Falcone saw the long-term future of health sciences as uncertain because of past volatility in the demand for nurses and the potential of increased competition among academic institutions vying for students interested in health-related professional programs. He testified that he had no empirical evidence that the College would sustain the nursing program in the near or distant future. Consistent with its decision to maintain flexibility, in recent years, the College has staffed its nursing program primarily with non-tenure-track faculty.

In the College's strongest, fastest growing programs and professional programs, the College does not hire people on tenure track anymore in order to maintain flexibility in the face of uncertainty. Although the College renovated its facility for its nursing program, it opted for modest renovations of existing space.

At the October 12, 2001, meeting of the Board of Trustees, President Falcone stated that the College possessed the luxury of planning for the future from a position of strength, thanks to the strategies of enrollment growth, program diversification, fund raising, and careful management and planning. President Falcone also noted the College's progress in establishing the nursing program.

- 18 -

In late 2001, President Falcone advised Dr. Bernier that he likely would recommend against granting tenure to all three of the remaining untenured positions in the Chemistry Department. He did not single out any individual faculty member in this discussion. Instead, he instructed Dr. Bernier to convey his concerns regarding a "tenured in" department to the Chemistry Department faculty, and to raise with them the possibility "that perhaps one of the non-tenured faculty members would like to consider a non-tenure-track and avoid a tenured position." (Falcone Dep. at 57). At the time President Falcone presented this option, he decided that if a candidate presented himself or herself for tenure consideration and was denied tenure, that candidate would not thereafter be considered for a non-tenure-track position.

On October 25, 2001, in his evaluation of the plaintiff's reappointment for Dr. Bernier, Dr. Schuder wrote: "Charlene worked very hard this past year to build a biochemistry major and was, of course, successful. Her leadership of this program is very much needed in the future. She is also working hard w/ undergraduate students initiating some research projects. Overall, I feel that Charlene represents an important part of the chemistry department and I certainly feel that she will be needed in the future." (Fox Aff., Exh. 24, Memo from Dr. Michael Schuder to Dr. Lynn Bernier, dated October 15, 2001).

In December 2001, Dr. Bernier went to Dr. Schuder, the chair of the Chemistry Department, and communicated that President Falcone likely would not recommend granting tenure to all three of the tenure-track faculty in Chemistry. In her meeting with Dr. Schuder, Dr. Bernier raised the possibility that if one of the three faculty members wished to move into a non-tenure-track position and remove his or her application from the tenure position, the College would grant him or her the open non-tenure position. The remaining two full-time

faculty members could present themselves for tenure consideration. Dr. Schuder indicated that he would take this information back to the department. Dr. Schuder voiced his opinion that there was an institutional need for four tenured faculty positions in the chemistry department. Dr. Schuder then met with President Falcone and presented a series of reasons as to why the College and the department needed to maintain four tenured faculty in the Chemistry Department.

In December 2001, more than two years before the plaintiff was scheduled to be considered for tenure by the Board of Trustees, Dr. Schuder met with the plaintiff, Dr. Kevin McMahon, and Dr. Piatt. Dr. Schuder communicated to the chemistry faculty that President Falcone had said that it was unlikely that all three of the tenure-track faculty in the Chemistry Department would receive tenure because President Falcone did not want to fully tenure a department. Dr. Schuder also told the candidates that if any one of them wanted to move directly into a non-tenure-track position, he or she could do so and the position would be given to that person. Dr. Schuder stated that no decision had been made with respect to which of the three faculty members would get tenure and the plaintiff had no basis to believe that such a decision in fact had been made at that time. The plaintiff was "devastated" when she learned in December of 2001 that it was unlikely that all three of the chemists would be tenured and she felt that "[her] future was uncertain." (Deposition of the Plaintiff [Plaintiff's Dep.] at 275).

The Faculty Executive Committee (FEC) was also advised that one of the three remaining untenured faculty members in the Chemistry Department would not get tenure, although no specific candidate was identified as the individual who would not receive tenure. The administration advised the Faculty Executive Committee that it did not want to tenure in

the department and that the College did not want to make the long-term financial commitment that tenuring all three candidates would require. The Faculty Executive Committee responded to and questioned assertions in President Falcone's December 2, 2002, memo regarding staffing and tenure issues in the Chemistry Department. See Fox Aff., Exh. 40. The stated rationale for the decision not to grant tenure to all three chemistry candidates was the cost of fully tenuring the Chemistry Department and the College's desire to maintain flexibility. (Deposition of John Symms [Symms Dep.] at 34).

At the February 14, 2002, meeting of the Academic Committee of the Board of Trustees, President Falcone stated that because the College would continue to see a softening of enrollment in some traditional programs, the College was "doing institutional research to find ways to measure the enrollment, program expense and potential of all existing programs." (Fox Aff., Exh. 25, Minutes of the Academic Committee of the Board dated February 14, 2002, at D4943). In response, Board Chair Bill Laatsch asked President Falcone how the results of this research would affect the tenure process.

## F.     THE 2002 BIENNIAL REVIEWS FOR THE CHEMISTRY FACULTY

In early 2002, the plaintiff, Dr. Kevin McMahon, and Dr. Piatt went through the biennial review process with the Tenure and Promotion Committee. Part of this process entailed a one-hour review session with the tenure-track faculty member, the Tenure and Promotion Committee, the Vice President for Academic Affairs, and the department chair. In advance of the review, the Tenure and Promotion Committee, which is comprised exclusively of faculty, provided an agenda for the review session. Items on the agenda included opening comments by the faculty member, consideration of the three criteria for promotion, comments by the department chair, and comments by the Vice President for Academic Affairs, among other

- 21 -

points.  In characterizing the "Comments by the Vice President for Academic Affairs," the agenda contained the following description:

    a.    Perceived institutional need for the faculty member's services.  [NOTE: The description of perceived need is intended to characterize the college's <u>current</u> situation.  It is <u>not</u> a guarantee about the future because the college is in a constant state of flux.]

(Plaintiff's Dep., Exh. 12.) (emphasis in original).  The plaintiff received this agenda and understood that Dr. Bernier would give a view of perceived institutional need at the review session.

    The plaintiff's review session took place on February 21, 2002, during which Dr. Bernier reiterated that one of the three chemists might not get tenure.  Dr. Bernier's comments were consistent with the information that Dr. Schuder had provided the entire department in December 2001.  The plaintiff was not given a clear yes or no answer on the question of need during the review session.

    The Evaluative Summary that the plaintiff received following the review session summarized Dr. Bernier's comments on need as follows:

Dr. Bernier prefaced her remarks by indicating that there was a probable need for Charlene's position at this time (and that Charlene's yeoman-like efforts increased that probability) but that the President made the final decision about that at the time he received the Tenure and Promotion Committee's recommendation.

(Plaintiff's Dep., Exh. 13.)

    Dr. Kevin McMahon had his review session on February 28, 2002.  His Evaluative Summary following that meeting characterized Dr. Bernier's comments on need as follows:

Dr. Bernier indicated a probable need for the position in the future and that the department Chair is familiar with staffing concerns in the area.  The ultimate decision will be made at the time of the tenure decision.

(Declaration of Lynn Bernier [Bernier Decl.], Exh. E).

Dr. Piatt went through his review session on March 7, 2002.  The Evaluative Summary following his review session summarized Dr. Bernier's comments on need as follows:

> Dr. Bernier questioned whether there is an institutional need for four tenured chemists, but suggested that three tenured chemists and one tenured environmental scientist might be different.  She said that it ultimately is the responsibility of the President to decide such matters.

(Bernier Decl., Exh. F).

On March 13, 2002, Dr. Bernier reappointed the plaintiff to the full-time tenure track position of assistant professor of chemistry for the period of September 1, 2002, through May 31, 2003.

At the plaintiff's biennial review in April 2002, Dr. Schuder "emphatically state(d) that Charlene should be tenured and had the skills to become the department's chair."  (Fox Aff., Exh. 28, Plaintiff's Fourth Year Pre-Tenure Review dated April 15, 2002, at 2).  Dr. Bernier also commended the plaintiff for her creation of the biochemistry major and her "successful navigation of its proposal through the political waters necessary for approval." Id. Dr. Bernier prefaced her statement by indicating that there was a "probable need" for the plaintiff's position at the time and within the Chemistry Department, that the plaintiff's "yeoman like efforts" increased that probability, but that the President made the final decision about that when he received the recommendation of the Tenure and Promotion Committee.  Id.

In May 2002, Dr. Schuder and Dr. Bernier conducted the plaintiff's second annual AGER.  Dr. Schuder's comments included: "Her teaching style is very student-centered . . . Charlene's willingness to teach new courses (CHE110 and CHE309 this year, and inorganic chemistry next year), attests to her confidence in her abilities and our confidence in her.  I see

- 23 -

Charlene as providing the model to the rest of us in the department for teaching innovation. (Fox Aff., Exh. 16, Plaintiff's Achievement and Evaluation Report for the 2001-2002 Academic Year at 8 [unnumbered]). He further commented: "The growth of the biochemistry major exceeds even her optimistic projections. This growth is occurring without a decrease in chemistry majors so it is not simply a shift within the department. . . . Charlene's impeccable organization and focus on detail make her the obvious choice to replace me as chair of the department of chemistry and biochemistry as soon as she receives tenure." Id.

In his comments on the plaintiff's evaluation for the 2002-2003 academic year, Dr. Schuder stated: "Charlene is a crucial link in our department. She provides ties between the chemistry and biology departments as well as between the department and admissions, the library and other faculty colleagues. Her focus at Carroll is undergraduate education, and she continues to be the model to the rest of us in the department for implementation of new pedagogical approaches. I fully support her goals and will do whatever possible to help her achieve all of them." Id. at 6 (unnumbered).

Dr. Bernier's comments on the plaintiff's 2002-2003 evaluation included: "The goals are focused and most have measures of success connected to them. I especially endorse the goals in the professional and scholarly area – I agree that they are ambitious, but valuable. Service to department and College is appreciated." Id. Dr. Bernier provided the plaintiff an "Institutional Value Weight" of 102%.

In August 2002, Dr. Schuder again met with the three tenure-track Chemistry Department faculty and indicated that he needed to know who wanted to be considered for tenure that year. During this meeting, Dr. Schuder indicated that if one person wanted to step into a non-tenure-track position, the remaining two would likely get tenure. No one in the

- 24 -

administration ever suggested to the plaintiff that she should opt for the non-tenure-track position. Dr. Schuder never met individually with the plaintiff's husband regarding the non-tenure position.

At the start of the 2002-2003 academic year, the plaintiff still had one year left to go before her tenure-track contract required that she apply to be reviewed for tenure, and she would have preferred to apply for tenure in September 2003, at the start of the 2003-2004 academic year. The plaintiff understood that her husband was required to make his tenure application during the 2002-2003 academic year and that Dr. Piatt, who also had another year left in which he could apply, had the option to apply during the 2002-2003 academic year instead.

In light of Dr. Schuder's renewed affirmation of defendant's intention of not granting tenure to one of the three tenure-track Chemistry faculty, the plaintiff became concerned that, if Dr. Piatt were to apply during the 2002-2003 academic year along with her husband, both could be given tenure, and her denial for tenure during the following year would be virtually assured, regardless of her merit or the continuing need for her services. The plaintiff attempted to find out from Dr. Piatt whether he intended to move his tenure application up by one year and apply during the 2002-2003 academic year. Dr. Piatt informed the plaintiff that he did intend to submit his tenure application in the fall of 2002, a year earlier than required.

On August 23, 2002, the plaintiff advised Dr. Schuder that she intended to submit her tenure portfolio a year early, in the fall of 2002. In the plaintiff's letter to Dr. Schuder advising him of her intentions, she made the following remarks:

> The reason for my early submission is based on two facts: (1) It has been recently decided that the college's administration will grant tenure to only two of the remaining three untenured chemists, Kevin McMahon, Joe Piatt, and

- 25 -

myself.  (2) Joe Piatt has decided to submit his tenure portfolio a year earlier than scheduled.

(Plaintiff's Dep., Exh. 14.)

**G.**     <u>**THE 2002 TENURE REVIEW PROCESS**</u>

In the fall of 2002, Dr. Schuder nominated the plaintiff, Dr. Kevin McMahon, and Dr. Piatt for tenure.  In nominating the plaintiff, Dr. Schuder stated:  "Charlene has clearly demonstrated skill and dedication in both teaching and research.  There is no doubt that her services are crucial to the chemistry department and Carroll College."  (Fox Aff., Exh. 32, Letter dated September 11, 2002, from Dr. Schuder to Dr. Bernier).

On October 15, 2002, Dr. Schuder submitted his letters of recommendation on behalf of each candidate to the Tenure and Promotion Committee.  In the letters, he reviewed each candidate's achievements with respect to effective teaching, professional and scholarly activity, and service to the College and the department.  Three other faculty members from outside the Chemistry Department who were up for tenure consideration – Nelia Beth Scovill (Religion) (female), Joel Heim (Religion) (male), and Penny Johnson (Computer Science) (female) -- similarly received positive recommendations from their department chairs.

On October 15, 2002, Dr. Schuder wrote to Robert Black, chair of the College's Tenure and Promotion Committee, recommending the plaintiff for tenure, stating in part:  "I foresee her assuming the role of department chair very quickly after tenure." (Fox Aff., Exh. 36, Dr. Schuder's letter to Dr. Black dated October 15, 2002).  On October 15, 2002, the Chemistry Department submitted to the administration a proposal to realign the Chemistry and Physics Department.

- 26 -

Concerned that there was "a storm rising," Dr. Peter Settle, President of the FEC, sent an email to Dr. Bernier in early October 2002, stating that the FEC would be meeting soon to discuss "tenure-imbalance-staffing related issues." (Fox Aff., Exh. 33, Dr. Settle's email at 2501-02). He asked that a representative of the administration appear at the meeting to talk about the "Chemistry situation." Id. Dr. Bernier forwarded Dr. Settle's email to President Falcone on October 6, 2002, and asked him what she should say to the FEC if she attended its upcoming meeting.

President Falcone responded by acknowledging the view of FEC member Linda Thompson that "the Imbalance Document precludes introducing institutional need as a consideration in tenure decisions," but stated that he disagreed with that interpretation. He asked Dr. Bernier: "We can't find anything in the document that backs up her interpretation (can we?)" Id. at 2501. President Falcone added: "I do not believe that we should tenure every member of an academic department, and we have communicated that to the chemistry department where the last three untenured faculty members are all coming up for tenure this year." Id.

Dr. Bernier suggested to President Falcone that he argue that he was not proposing to eliminate the possibility of four tenured chemists at some time in the future, but that at this point in time, in his judgment, it was in the best interest of the College to fill the position with a full-time, non-tenure-track person. Id. at 2499. Dr. Bernier added that the "interpretive document" states: "Allocated tenure-track lines will be filled with full-time, tenure-track faculty. Exceptions are made only with the annual concurrence of the FEC for each exception." Id. Dr. Bernier further stated: "Here, of course, we are out of compliance . . . but the FEC

- 27 -

certainly has not objected and in fact went along with adding FTNTT [full-time non-tenured track] status and with staffing with those faculty." Id.

In response to President Falcone's statement that he did not believe the College should tenure every member of an academic department and that this had been communicated to the Chemistry Department, Dr. Bernier replied: "[Y]ou should understand that this sends a wave of terror through untenured tenure-track faculty who assume that if they do a good job, 'play by the rules,' they will be awarded tenure." Id.

Later in October, the Tenure and Promotion Committee held tenure review meetings with each of the three candidates from the Chemistry Department. After considering the dossiers submitted from each candidate, Dr. Schuder's recommendations, and the information from the hearing, the committee determined that all three Chemistry Department candidates met the "various requirements specified in the document entitled Conditions of Employment at Carroll College." (Bernier Decl., Exhs. J-L.)

The Tenure and Promotion Committee voted unanimously to recommend each of the three Chemistry Department candidates for tenure. In recommending the plaintiff for tenure on October 22, 2002, the Tenure and Promotion Committee stated that she met the criteria specified in the conditions of employment. The Tenure and Promotion Committee does not share its in camera deliberations with the Chief Academic Officer or anyone else, and it did not do so with respect to the chemists.

Dr. Bernier clearly communicated to the Tenure and Promotion Committee during the tenure review process that the administration had decided that it would not "tenure in" the Chemistry Department. The committee had been aware of this position well before the chemists came up for tenure. Dr. Bernier asked the committee to rank the chemists, but the

- 28 -

committee refused to do so. Dr. Bernier also asked Dr. Schuder, the department chair, to rank the three chemists, but he refused because he believed that all three equally merited tenure.

The Tenure and Promotion Committee also held tenure review meetings with the three candidates for tenure from outside the Chemistry Department. The committee also recommended in favor of tenure for those three candidates. Dr. Bernier did not disagree with the conclusion of the Tenure and Promotion Committee and, in her mind, the qualifications of the three were never in question.

After receiving the recommendations of the Tenure and Promotion Committee, Dr. Bernier found the candidates to be equally qualified in terms of merit and she turned to the consideration of need. Dr. Bernier's focus with respect to the question of need was on whether a need exists for a tenured position in a particular department or program, given her judgment of the medium- and long-term interests of the College. She considers whether the College should tenure a particular position at a particular time, given what else is going on. Dr. Bernier examined enrollment trends in the Chemistry Department. She noted increasing enrollment in lower division courses in chemistry, including the service courses for nursing students. The plaintiff taught these service courses in addition to other advanced courses.

Dr. Bernier determined that the increase in enrollment in chemistry courses was driven, in significant part, by increased enrollment in the College's health programs. She considered enrollment in the health programs to be volatile over time because of past enrollment patterns and the possibility of increased competition as other local educational institutions set up nursing programs. Dr. Bernier expected a significant overall drop in enrollment at the College starting in 2008, based on high school demographics. She concluded that the enrollment

- 29 -

trends in chemistry did not demonstrate a need for three additional tenured faculty in the department.

Dr. Bernier also knew that the number of credit hours in the Chemistry Department had increased in recent years. She did not believe that this credit-hour increase weighed heavily in favor of granting tenure to three faculty members in that department because of the role of introductory-level courses and service courses in this increase. She also recognized that majors in chemistry had increased in recent years, but that even with this increase, chemistry did not attract what she considered to be a large number of majors at the College.

For the time period from the fall of 1996 to the fall of 2002, the number of students declaring a chemistry major in any given academic year ranged from a minimum of twenty-four (24) to a maximum of sixty-two (62), and the number of declared majors in chemistry increased and decreased from year-to-year during that time frame. Biochemistry, a new major established by the plaintiff in the fall of 2001, had three (3) declared majors in the fall of 2001, and eleven (11) declared majors in the fall of 2002.

Dr. Bernier did not believe that the overall increase in majors in chemistry established a need for three additional tenured faculty members given the total number of majors involved. She anticipated that the College would continue to offer the courses currently taught by the three tenure-track faculty in Chemistry in the foreseeable future. No requirement exists, however, that any particular course at the College must be taught by a tenured or tenure-track faculty.

Dr. Bernier reviewed information concerning enrollment, credit hours, and majors within the context of her prior discussions with Dr. Falcone regarding the advisability of "tenuring in" the Chemistry Department on a long-term basis. She knew that Dr. Falcone would not

- 30 -

recommend granting tenure to all three faculty members up for tenure in the Chemistry Department. She also understood that the College financially had a narrow margin of error, and that an award of tenure carries a substantial financial impact that can last decades.

Dr. Bernier concluded that in light of the College's financial status, the long-term financial commitment that tenure represented and the College's desire to retain staffing flexibility in the face of what she viewed as uncertain enrollment and competition, the College did not have a need for three additional tenured faculty in the Chemistry Department. She concluded that the long-term needs of the College would be best served by keeping one of the tenure-track positions in Chemistry open, and by using non-tenure-track or adjunct faculty to teach the courses served by that position. Dr. Bernier believed that this decision would provide necessary staffing flexibility on a long-term basis.

Dr. Bernier then faced the task of identifying who, out of the three chemists, would receive a negative recommendation for tenure. At Dr. Falcone's direction, Dr. Bernier consulted with Dr. Schuder, the department chair, to determine which of the three positions the College could keep open and maintain some staffing flexibility. Dr. Schuder did not identify an individual as the person who should not receive tenure because he strongly believed that all three merited tenure. Dr. Black, Dr. Settle and Dr. Symms all concurred that the three chemists equally merited tenure.

Dr. Bernier asked Dr. Schuder for his opinion on the functions served by the candidates, and about which functions could most easily be served with the use of faculty not on a tenure track. Dr. Schuder advised her that he believed the College could most easily find a qualified person to teach biochemistry who was not on a tenure track. He also advised Dr. Bernier that he thought it would be more difficult to find a qualified candidate to teach across

- 31 -

departments or disciplines, such as environmental science and chemistry (a function performed by Dr. Piatt), or forensic science and organic chemistry (a function performed by Dr. Kevin McMahon), absent a tenure-track position. Dr. Bernier gave great weight to Dr. Schuder's opinion in her need analysis.

Dr. Bernier also considered the plaintiff's involvement (as opposed to Dr. Kevin McMahon or Dr. Piatt) in teaching service courses. Consistent with Dr. Bernier's view at the time she examined need with respect to the Chemistry Department and despite strong demand for nurses in the job market, the number of entering freshman committed to the nursing program dropped fifteen (15) percent from the fall of 2004 to the fall of 2005. The plaintiff's expert, Dennis Dresang, testified that a demand existed at Carroll for courses in the health sciences, regardless of what other colleges and universities in the region offered.

Based upon the information from Dr. Schuder and her understanding of the positions held by the three candidates in the Chemistry Department, Dr. Bernier decided that she would make a negative recommendation for tenure for the plaintiff and a positive recommendation for Dr. Kevin McMahon and Dr. Piatt. Dr. Bernier also decided to make a negative recommendation, based on need, for the two candidates from the Religion and Philosophy Department, Nelia Beth Scovill and Joel Heim.

On November 27, 2002, Dr. Peter Settle, Faculty President, wrote a memo to President Falcone regarding staffing in the Chemistry Department. On December 2, 2002, President Falcone responded to Dr. Settle's memo. On December 17, 2002, the Faculty Executive Committee sent a memo to President Falcone regarding his interpretation of the November 27, 2002, FEC memo about tenure. The Conditions of Employment require that Dr. Bernier give her recommendation to the President by December 7.

- 32 -

On December 2, 2002, the plaintiff met with Dr. Bernier. The plaintiff had requested the meeting with Dr. Bernier, without indicating the purpose of that meeting. The plaintiff, who had become pregnant a little over a month earlier, started the meeting by announcing her pregnancy to Dr. Bernier. The plaintiff had timed her pregnancy to deliver the baby during the summer, hoping to obviate the need for the College to provide maternity leave and a suitable substitute for her during the school year. Dr. Bernier was cordial and happy and she congratulated the plaintiff. She appeared genuinely happy, albeit not surprised, as she indicated that she assumed that the plaintiff would have other children.

According to the plaintiff, Dr. Bernier referenced the non-tenure-track position and said that the College was moving towards employing more and more people in such positions. She stated that the College did not want "to get rid of any of the chemists, we just want flexibility." (Plaintiff's Dep. at 84-85). Dr. Bernier recalls that she stated that the College planned to staff the Chemistry Department to include one full-time non-tenure-track position. The plaintiff said "emphatically" that she deserved tenure and was committed to the College, to which Dr. Bernier responded that the decision on tenure was for the President and the Board. (Plaintiff's Dep. at 86). The plaintiff told Dr. Bernier that her pregnancy would not diminish in any way her dedication or commitment to the College. When the plaintiff stated that she hoped her pregnancy would not factor into the decision, Dr. Bernier responded that "to do so would be unlawful." (Plaintiff's Dep. at 85). During the meeting, the plaintiff mentioned to Dr. Bernier that Dr. Piatt and his wife were also expecting a baby.

On December 7, 2002, Dr. Bernier forwarded to President Falcone her recommendations regarding the applications for tenure by the three candidates pursuant to the Conditions of Employment, stating: "[u]pon review of the faculty members' credentials,

- 33 -

as well as consideration of continuing institutional need for each candidate's service, I recommend" Kevin McMahon and Joseph Piatt for tenure, and against tenure for the plaintiff. (Fox Aff., Exh. 39, Memo from Dr. Bernier to President Falcone dated December 7, 2002). Dr. Bernier's recommendation does not mention anything about the purported consultation with Dr. Schuder or about defendant's ease-of-replacement rationale.

Dr. Bernier and President Falcone again discussed staffing and their concerns about fully tenuring the Chemistry Department. In President Falcone's view, "we had a department of four full-time tenure track people, that granting tenure to all four of them would have meant that we would have locked in our staffing for approximately the next 30, 35 years and that was, in my judgment, imprudent." (Falcone Dep. at 72). He considered it his responsibility to look at the long-term direction of the College and the budget implication of the tenure decision in reaching his own recommendation.

Based upon his concerns about tenuring in the Chemistry Department and the opinion of the department chair, Dr. Schuder, President Falcone concluded that he would recommend against tenure for the plaintiff. He agreed with Dr. Bernier's recommendations that Dr. Scovill, Dr. Heim, and Dr. Johnson not receive tenure based upon need considerations.

On December 18, 2002, President Falcone wrote to the plaintiff, thanking her for her ongoing dedication and loyalty, stating he was pleased to provide a salary increase.

On January 13-14, 2003, Dr. Bernier and the plaintiff exchanged emails regarding the search for an adjunct to teach upcoming chemistry courses. The plaintiff wrote: "After searching for 3 months, we are still unable to find an adjunct to teach Che 102." (Fox Aff., Exh. 43, Emails between Dr. Bernier and the plaintiff dated January 13-14, 2003). Dr. Bernier responded: "[S]orry not to have any ingenious ideas of how to come up with a faculty member

- 34 -

at this date. As I recall though, Mike had a plan for staffing with current faculty if all else failed, and it sounds as though it has." Id. The plaintiff responded: "Staffing with current faculty means me, since I'm the only one in the department who can teach biochemistry. Although not ideal, it will work." Id. Dr. Bernier concluded: "It sounds as if you exhausted all possible avenues for seeking faculty. Did you also check the Medical College? Is that a realistic possibility for future reference?" Id.

The Academic Committee of the College's Board of Trustee's met on February 18, 2003, and considered whether to recommend granting tenure to the six tenure candidates, three women and three men. During this presentation, William Laatsch, Ph.D., the chairman of the Committee, gave a description of the tenure review process. As reflected in the meeting minutes, Dr. Laatsch "presented the steps and the criteria used in the process and stated that trustees are solely responsible for approval of the candidates recommended for tenure and promotion. The criteria for the decisions at the board level are based on institutional need, staffing flexibility, program diversification and enrollment trends." (Falcone Decl., Exh. L). The Academic Committee was advised that the Tenure and Promotion Committee had recommended all six candidates for tenure, as had each candidate's department chair.

During the meeting, President Falcone presented his recommendations on tenure and Dr. Bernier also provided information. They did not present a candidate-to-candidate comparison of the relative merits of each candidate.

Dr. Laatsch and other members of the Academic Committee expected that the background and assessment on the individual candidates would have been developed and evaluated by the time the tenure decision reached the Board. Rather than looking for an

- 35 -

explanation of the "pluses and minuses" of each tenure candidate, the Committee members relied on the work done by President Falcone and Dr. Bernier before coming before the Committee. After some discussion, the Academic Committee unanimously voted to follow President Falcone's recommendations and, in turn, to recommend to the entire Board granting tenure to Dr. Kevin McMahon and Dr. Piatt, and denying tenure to the plaintiff and Drs. Scovill, Heim, and Johnson.

The tenure decisions went to the full Board that same day. As reflected in the meeting minutes, Dr. Laatsch again reviewed the tenure process and the criteria for decisions at the Board level, and advised the Board of the positive recommendation by the Tenure and Promotion Committee for all six candidates. The Academic Committee presented its recommendation on the tenure candidates, President Falcone made comments regarding the rationale for his own recommendation, and some discussion occurred. Dr. Laatsch described the discussion as short (approximately ten to fifteen minutes), but sober and very serious. The Board, acting on the advice of the Academic Committee, which, in turn, relied upon the recommendations of President Falcone and Dr. Bernier, voted unanimously to award tenure to Dr. Kevin McMahon and Dr. Piatt, but to deny tenure to the plaintiff, Drs. Scovill, Heim, and Johnson.

With regard to the Chemistry candidates, neither the Academic Committee nor the Board was provided with any statistics regarding enrollment trends or specifics on the courses taught by the particular candidates. The trustees similarly were not told that Dr. Schuder had indicated that the plaintiff's position would be easier to staff with faculty not on a tenure track.

Dr. Stevens, a member of the Faculty Executive Committee, and formerly the Provost at the College, testified that providing such detailed information to the Board "typically . . . was

- 36 -

not done." (Deposition of Gary Stevens [Stevens Dep.] at 33). In his experience, the "typical trustee" wants the "bottom line" and not "all of the detail." Id. at 32-33. Dr. Black, then the chair of the Tenure and Promotion Committee, and one of the authors of the Conditions of Employment, testified that the trustees typically do not conduct their own investigations of tenure candidates. (Black Dep. at 120). Rather, at the College, the Board typically follows the recommendation of the President on tenure decisions.

According to Dr. Laatsch, the College's Board of Trustees' procedure for granting tenure is to fundamentally accept the recommendation of the president, noting that it would be "highly unusual" for a Board not to accept the recommendation of the president. (Deposition of William Laatsch [Laatsch Dep.] at 12). Pershing McAllister testified that he believed that President Falcone maintained the right to make any decision he wanted with respect to his recommendations to the Board, and as far as he (McAllister) was concerned, President Falcone could do so even if his decision was arbitrary and capricious.

Robert Black, Gary Stevens, Peter Settle, Lori Kelly, and John Symms each strongly supported the candidacy of the plaintiff for tenure, and disagreed with the decision to deny her tenure. Dr. Black considers himself adverse to the College on that issue. Dr. Kelly testified that she was "stunned" by the decision not to award the plaintiff tenure. Dr. Settle believed that the plaintiff should have received tenure, and he generally disagrees with the current direction of the College. The decision to deny tenure to the plaintiff "did not make sense" to Dr. Stevens. Dr. Symms characterized the decision to deny tenure to the plaintiff as "horrendously bad."

- 37 -

President Falcone advised the plaintiff of the Board's decision not to grant her tenure by letter dated February 21, 2003. The letter stated:

> I write to inform you that on February 18, 2003, the Board of Trustees of Carroll College voted not to grant you tenure at the College.
>
> As a result of this action, your appointment in the position of Assistant Professor of Chemistry and Biochemistry will end on May 31, 2004.
>
> You will receive your salary and elected benefits through June 30, 2004. Please contact Barb Christus for information on payroll and benefit matters.

(Plaintiff's Dep., Exh. 15). The other candidates denied tenure – Dr. Scovill, Dr. Heim, and Dr. Johnson – each received virtually identical notices. A candidate denied tenure is not usually told the reasons for that denial.

On March 31, 2003, the Board of Trustees wrote to the faculty:

> Over the past decade faculty have opposed a series of significant institutional changes proposed by the administration and unanimously approved by the board of trustees (the calendared changes, dropping several academic majors, creating Two Schools, and tenure denials). In every one of these decisions the board of trustees was carefully and fully apprised of the issue, the opposing views, the potential consequences and faculty reaction to our decisions.
>
> Before making our decisions trustees regularly heard from the faculty president who makes an uncensored report to the board at each of our meetings. Further, the Board has invited three faculty members to join our two most recent Strategic Thinking retreats where we encourage the faculty to participate openly and fully. Each summer for the past nine years the chairman of the board has met with faculty for an open discussion of their issues. The substance of those discussions was subsequently reported to the board. Contrary to what some have claimed, at no time have trustees prohibited faculty from contacting board members. In short, we have created opportunities for direct input to the board from faculty. We have listened carefully, we have considered the faculty viewpoint, we have made our judgments, and again, they were based upon our belief in what is best for Carroll College and our students.

(Plaintiff's Aff., Exh. 58, Memo from the Board of Trustees to the College Faculty dated March 31, 2003).

- 38 -

On February 14, 2003, President Falcone responded to the Strategic Directions Task Force recommendations. The Task Force had submitted a summary of its work to President Falcone in a letter with attachment dated December 19, 2003, The Task Force had recommended that the Chemistry Department maintain its investment due to growing enrollment and interest. In his email response, President Falcone stated that the Task Force's recommendations have provided the College with "a serious example consideration of how we should proceed to strengthen Carroll College." (Fox Aff., Exh. 44A, President Falcone's email to Faculty sent on February 14, 2003). President Falcone continued: "They saw a problem, established a methodology for addressing it, and exercised good judgment in developing strong, clear and focused recommendations." Id. He further stated that the Task Force's effort "are a wonderful example of how shared governance should work." Id. "As a result, their work will have an impact on administration and Board decisions." Id.

On April 9, 2003, Dr. Bernier met with the plaintiff and her husband to discuss the reasons for the tenure denial. In preparation for the meeting, Dr. Bernier prepared a statement, which she then read to the McMahons. Dr. Bernier explained the tenure process, indicating that the Tenure and Promotion Committee, the Vice President for Academic Affairs, the President, and the Academic Committee make recommendations, but that the whole Board makes the final decision. Dr. Bernier noted that the Board uses long-term contexts and considers the well being of the College when making tenure decisions.

With respect the plaintiff, Dr. Bernier stated that the decision was not based on her individual merit, but because of institutional need. Dr. Bernier elaborated that the Board denied tenure because it did not believe it would be wise to commit to a tenured faculty

- 39 -

member in the plaintiff's field (biochemistry) in the Department of Chemistry, given current and possible future conditions.

Dr. Bernier noted that the assessment on the plaintiff's candidacy included an assessment of current and projected program needs and enrollment trends, both at the College as a whole, in the sciences and health sciences, and in chemistry. She reiterated that the College is in a constant state of flux and that the Board considers the College's long-term development.

In May 2003, the College summarized its institutional need considerations in denying tenure to the plaintiff as follows:

- Granting tenure to all three candidates would mean that 100% of the faculty in the department would be tenured.

  - All are in early 40's
  - Possibility of faculty renewal limited
  - No new faculty to be added in foreseeable future

- Enrollment patterns could change

  - Number of chemistry majors
  - Number of non-major students taught (nursing and health science students) could shift
  - The Biochemistry position identified for replacement

(Falcone Decl., Exh. O).

## H.   PLAINTIFF'S REQUEST FOR CONTINUED EMPLOYMENT AT THE COLLEGE AFTER HER TENURE DENIAL

The College has adopted the American Association of University Professor's "1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments" ("AAUP Statement on Tenure" or "Statement"), and that Statement is appended to the Conditions of Employment. The AAUP Statement on Tenure provides: "[I]f the decision [on

- 40 -

tenure] is negative, the appointment for the following year becomes a terminal one." (Falcone Decl., Exh. E, Attachment, 1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments at 23).  The general rule in academia is that if a faculty member is denied tenure, he or she completes a terminal year of employment and then leaves the institution.

The Occupational Outlook Handbook published by the United States Department of Labor's Bureau of Labor Statistics for 2004-2005 states that faculty "denied tenure usually must leave the institution." (Schutz Dep. at 69, Exh. 11.)  The general rule that faculty denied tenure leave after their terminal year applies at the College.  (Symms Dep. at 35.)

Kevin Schutz, the plaintiff's proffered vocational expert, testified as follows:

Q:    Well, if you're denied tenure, you're normally, in higher education, not permitted to stay at the institution after the term of your employment, correct?

A:    Right.

Q:    And that's your understanding as an expert in the field, correct?

A:    It's my understanding based on [the Occupational Outlook Handbook] and also . . . personal and professional experiences.  The concept is, they've determined that this person is not someone they want to keep around, so the person usually goes away.

Q:    So there's no law that would forbid a college or university from employing someone after denial of tenure, but that would be unusual for a college or university to do so, correct?

A:    I think that's accurate, yes.

(Deposition of Kevin Schutz [Schutz Dep.] at 70).

Barbara Lee, the defendant's expert on tenure, stated that the AAUP did not prohibit or permit the College from hiring the plaintiff in the non-tenure position.

- 41 -

In Spring 2003, Dr. Schuder expressed to Dr. Bernier that the plaintiff was very interested in filling the non-tenure position and that, in his opinion as department chair, the plaintiff remained clearly qualified to fill the non-tenure-track position and that his desire would have been for her to be given the position.

On February 24, 2003, the plaintiff sent Dr. Bernier an email asking to discuss the non-tenure-track position that had been raised previously with the candidates from the Chemistry Department and requesting consideration for that position. Dr. Schuder also contacted Dr. Bernier on the plaintiff's behalf to inquire about her continued employment. Dr. Bernier responded to the plaintiff and Dr. Schuder by email dated February 26, 2003, in which she stated: "[b]ecause of the current disarray on campus, I will not be able to give you an answer to your latest question. When we return to some semblance of normalcy, ask me again." (Plaintiff's Aff., Exh. 50, Email from Dr. Bernier to Dr. Schuder and the Plaintiff dated February 24, 2003).

On March 7, 2003, Dr. Schuder sent Dr. Bernier a letter in which he provided a "rationale to support the immediate offering of a full time, non-tenure-track position to [the plaintiff]." [Bernier Dep., Exh. 8). Dr. Schuder wrote:

> Assuming that we hire a full time, non-tenure position in chemistry, as was indicated to be the College decision by both yourself and Dr. Falcone, this person will almost certainly be less qualified than Dr. McMahon. Other recent Carroll non-tenure-track hires have been based on local searches. The likelihood of finding a Ph.D. biochemist with seven years of teaching and research experience willing to take a non-tenure-track position seems quite remote. Additionally, Dr. McMahon is able to teach freshman chemistry (CHE 109 and 110), nursing chemistry (CHE101 and 102), advanced inorganic chemistry (CHE302) and the new nutrition course (CHE208). If one places those additional expectations on potential new faculty, it seems even more absurd to believe that we could find one in the Milwaukee area.

- 42 -

Id. In his closing remarks, Dr. Schuder noted that he "kn[ew] full well that a chemistry department will survive no matter what decisions you make and that no faculty member is irreplaceable. However, the decision to offer the non-tenure-track position to Charlene will provide the support needed to have a strong chemistry and biochemistry department for the short and long term." Id.

On April 4, 2003, in anticipation of a meeting with Dr. Bernier to discuss the reasons for the tenure denial, the plaintiff submitted written questions to Dr. Bernier, which included the question: "Why were my two male colleagues chosen over me?" (Plaintiff's Aff., Exh. 59, Email and attachment from the plaintiff to Dr. Bernier dated April 4, 2003). Dr. Bernier postponed the scheduled meeting pending receipt of the plaintiff's questions which Dr. Bernier anticipated she would have to review with the College's attorney.

At their April 9, 2003, meeting, Dr. Bernier advised the plaintiff that she would not be considered for a non-tenure-track position in the Chemistry Department because she had been denied tenure. Dr. Bernier indicated that to consider her for non-tenure-track employment would be against AAUP principles.

On June 16, 2003, the plaintiff observed that "[t]he practical effect of [Carroll's] actions [to that point was] to terminate my employment by Carroll College as of May 31, 2004, the end of the four-year tenure-application period specified in my original contract. So far as I am aware, the College will not employ me in any capacity after that." (Plaintiff's Dep., Exh. 11). Dr. Heim never made a complaint to the College of sex discrimination or discrimination based on any other protected characteristic.

Although President Falcone was asked to consider re-employing Dr. Heim, Dr. Johnson, Dr. Scovill and the plaintiff in non-tenure-track positions after they had been denied

- 43 -

tenure in February 2003, in each case he refused. Before tenure recommendations were made in late 2002, and before he had decided that it was the plaintiff who would not be recommended for tenure from the Chemistry Department, President Falcone had decided not to employ any 2003 tenure candidates who might be denied tenure by the Board, post-tenure denial. His decision not to re-employ the unsuccessful Chemistry Department tenure candidate, post-tenure denial, was made before the plaintiff made any complaint of discrimination, and was based on the concept that a "terminal year" in a tenure process is "terminal." (Falcone Decl. ¶¶ 25, 27.)

Dr. Bernier presented President Falcone with the issue of whether the College would deviate from the general "up or out" rule, such that the individuals denied tenure in February 2003 could obtain subsequent employment at the College in some position not on a tenure track. She did not make a recommendation on this issue.

President Falcone advised Dr. Bernier that the College would not re-employ any of the individuals who had been denied tenure in February 2003. He considered a tenure denial to be a termination of services, and "terminal year meant terminal year." (Falcone Dep. at 102.) The decision not to reconsider the "no re-employment" rule for the faculty denied tenure in February 2003 was made by President Falcone.

I.      **PLAINTIFF'S APPEALS OF THE TENURE DENIAL**

On February 28, 2003, the plaintiff appealed the decision to deny her tenure to the Faculty and Staff Concerns Committee (FSCC) by email. She stated that the denial was discriminatory and violated important procedures as detailed in the Faculty Manual and other documents. The Faculty and Staff Concerns Committee is a consultative committee comprised of four faculty members and four administrative staff members (not to include the

- 44 -

President or any senior administrative officers).  (Falcone Decl., Exh. C, Governance at Carroll College, § IV(C)(4)(c).)  The plaintiff does not recall whether she delivered a copy of the appeal to anyone else in administration.

In her appeal, the plaintiff stated:  "While there is no guarantee of tenure provided at any institution, the vast majority of institutions (including this one prior to this year) feel obligated to award tenure when it is deserved based on merit and institutional need." (Bernier Decl., ¶ 40, Exh. A at P-0494).  The plaintiff challenged the Board's decision on multiple grounds, including her view that the "[d]enial was based on sex/gender and/or disability or a violation of tenure standards."  (Bernier Decl., Exh. A at P-0495).

The College maintains an administrative means to address allegations of sex discrimination by faculty members in situations involving reappointment.  The defendant's expert, Barbara Lee, testified that faculty members who experienced discrimination maintain appeal rights under the College's Academic Due Process document.

The FSCC issued its conclusions and recommendations on April 28, 2003.  The FSCC found the plaintiff's claims of sex discrimination to be beyond its purview and suggested that she take her concerns to the Faculty Board of Inquiry (FBI).  President Falcone knew of the plaintiff's appeal to the FSCC, but he does not recall when in the process he first learned of it or when he first understood that she was claiming sex discrimination.  (Falcone Dep. at 89.)

In May 2003, the plaintiff sent President Falcone an email in which she requested that he convene the Faculty Board of Inquiry to examine her tenure denial.  On May 14, 2003, President Falcone sent a response to the plaintiff in which he requested a written statement setting forth the specific reasons that the FBI should be convened.  In this memorandum,

- 45 -

President Falcone explained that the FBI serves in an advisory capacity and that it did not have the authority to change decisions made by the Board.

Despite the plaintiff's stated position in her plea to the FBI that she believed the actions taken against her violated the Faculty Manual and were discriminatory, President Falcone wrote: "I have reviewed your request to convene the Faculty Board of Inquiry ("FBI") and am prepared to do so. However, as you know the FBI is not convened lightly, or for reasons that can be addressed by other, more appropriate committees or means. Therefore, prior to responding to your request, I ask that you submit to me a written statement which details the specific reasons why the FBI should be convened." (Fox Aff., Exh. 66, President Falcone's Letter to the plaintiff dated May 14, 2003). The plaintiff submitted a statement, as requested by President Falcone, on June 20, 2003. The FBI was convened in the fall of 2003.

The FBI may hold joint prehearing meetings with the parties in order to simplify issues, effect stipulations of fact, and provide for the exchange of documentary information. The FBI affords the faculty member an opportunity to obtain necessary witnesses and documentary evidence and the administration will cooperate with the board of inquiry in securing witnesses and making available documentary evidence. The faculty member and the administration have the right to confront and cross-examine all witnesses.

If the FBI concludes that the evidence in the record has not established adequate cause for dismissal, it will so report to the President. The President can decide to read the report If he wants. (Symms Dep. at 31). If the President rejects the report, he will provide written reasons for doing so to the FBI and to the faculty member before transmitting the case to the Board. Any determination by the FBI is not binding on the College.

- 46 -

On May 5, 2003, Dr. Bernier wrote a letter of recommendation for the plaintiff to pursue other employment. She explained the reasons for the tenure denial as follows: "This spring, the Carroll College Board of Trustees decided not to grant Dr. McMahon tenure in the department for reasons related to institutional need. More specifically, the Board's decision not to confer tenure was not based on an absence of merit in Dr. McMahon's instruction, scholarship, or service. . . . Rather, the Board's decision was in response to short- and long-term institutional needs." (Fox Aff., Exh. 67, Dr. Bernier's Letter of Recommendation dated May 5, 2003 at 1). The letter did not address anything about electing to staff the plaintiff's position with non-tenured faculty, nor anything about her presence being easier to replace than the other chemists up for tenure.

On July 24, 2003, President Falcone wrote to the plaintiff describing her options for her terminal year of employment. Regarding the tenure decision, he wrote that the Board was required to review, among other factors and recommendations, "all of the issues and concerns that relate to the academic and financial well-being of the College; i.e., institutional need." (Fox Aff., Exh. 72, Letter from President Falcone to the plaintiff dated July 24, 2003).

According to President Falcone, the Board considers numerous factors in making its tenure decision including: 1) the recommendations the Board receives from the Tenure and Promotion Committee, the Vice-President for Academic Affairs and the President; 2) the College's financial state, historically, currently, and in the predictable future, as well as the current and projected program needs and enrollment trends both for the College as a whole and in a particular department; 3) an analysis of a broad range of information, including the information from the Academic Affairs Office, Advancement Office, Business Office and Admissions Office, the current and projected state of the national, regional and local

- 47 -

economies, and the College's endowment and evolving program needs; and 4) the immediate needs of the College against a longer-term prediction of what the College will need in the future in terms of faculty numbers and faculty specialties. President Falcone concluded the letter: "For the Board, long-term and potential long-term need developments are more important than simply responding to short-term trends." (Fox Aff., Exh. 72, Letter from President Falcone to the plaintiff dated July 24, 2003).

On November 18, 2003, Dr. Bernier wrote to the plaintiff to reconfirm the plaintiff's teaching duties for the 2003-2004 academic year. The College advertised for a faculty position in biochemistry in late 2003.

While employed at the College, the plaintiff was the only member of the Chemistry Department qualified to teach courses in chemistry and biochemistry. The plaintiff taught in three programs (chemistry/biochemistry, health science and nursing). Dr. Kevin McMann taught in one program and Dr. Piatt taught in two programs.

On January 23, 2004, after the plaintiff submitted an application for the full-time non-tenure-track position in the Chemistry Department Dr. Bernier responded to the plaintiff, explaining that the College would not consider the plaintiff's re-employment. Without articulating any specific reasons for refusing to consider the plaintiff's application, Dr. Bernier wrote: "You are not eligible for employment or re-employment with the College following the conclusion of this academic year. We thank you for your interest in the Chemistry Department position, however the College will not be reviewing your application for any future employment or reemployment with the College." (Fox Aff., Exh. 83, Dr. Bernier's Letter to the plaintiff dated January 23, 2004).

- 48 -

On April 30, 2004, in response to the College's advertisement for a biochemistry position at the College, the plaintiff submitted an application. On May 4, 2004, Dr. Bernier rejected the plaintiff's application and informed her that the College would not consider her for any future employment.

On May 6, 2004, the FBI issued its report to President Falcone in the matter of the College's recent tenure denials.

## J.    THE PLAINTIFF'S FEDERAL COMPLAINT

On October 10, 2003, the plaintiff filed a discrimination complaint with the Wisconsin Equal Rights Division (ERD), in which she alleged discrimination based on sex and retaliation for opposing discrimination in the workplace. She challenged the denial of tenure and she also claimed that the College's position with respect to the full-time non-tenure-track position that was communicated to her on April 9, 2003, constituted retaliation for her FSCC complaint.

The plaintiff filed her original complaint in this action on December 10, 2003, which she subsequently amended on February 24, 2004. (Complaint). In her complaint, the plaintiff alleges the following four causes of action: (1) breach of contract; (2) retaliation/breach of contract; (3) sex discrimination; and (4) retaliation. (Stipulated). The plaintiff knows of no negative remarks made by Dr. Bernier, President Falcone, or any member of the Board regarding women, pregnancy, or her complaint of discrimination.

President Falcone and the Board members were not aware of the plaintiff's pregnancy during the tenure review process. Neither Dr. Scovill nor Dr. Johnson were pregnant at the time they were denied tenure.

From 1993 through the tenure decisions in 2003, the College awarded tenure to twenty-four (24) faculty members eligible for consideration, sixteen (16) of whom were women.

- 49 -

During that same time period, the College denied tenure to eight (8) candidates eligible for consideration, five (5) women (Rebecca Steffes, Janice Zimbelman, the plaintiff, Dr. Scovill, and Dr. Johnson) and three (3) men (Jeffrey Jackson, Joaquin Suro, and Joel Heim).

Seven years earlier, Robert Black, then Vice-President of Academic Affairs and Dean of the Faculty, had recommended that Rebecca Steffes, a librarian, be denied tenure by the Board of Trustees. She was denied tenure in 1996. Subsequently, Ms. Steffes was hired back by the College in a non-tenure-track position. Ms. Steffes was the circulation librarian, not a member of the teaching faculty. She was eligible for tenure as contemplated by the Conditions of Employment. (Fox Aff., Exh. 108, Academic Due Process at Carroll College, § 1.B.).

Following the decision to deny her tenure, President Falcone gave his approval to continuing Ms. Steffes's employment in a part-time administrative position. President Falcone made this exception to the general rule against re-employing faculty denied tenure because he believed that the position held by Ms. Steffes never should have been classified as tenure eligible in the first instance.

Ms. Zimbelman, who taught in the physical therapy program of the Health Sciences Department, went up for tenure consideration by the Board in 2002. The Tenure and Promotion Committee recommended against granting Ms. Zimbelman tenure based upon the merit criteria. Dr. Bernier recommended against tenure for Ms. Zimbelman and she was ultimately denied tenured.

The department chair of the Health Sciences Department subsequently went to Dr. Bernier to discuss the needs of her department and raised the possibility of a limited appointment for Ms. Zimbelman following her terminal year. A significant purpose of this

- 50 -

limited term appointment, as presented by the department chair, was to allow Ms. Zimbelman to act as a liaison between the College and the Medical College of Wisconsin to further develop shared research and scholarship opportunities between the two institutions.

Dr. Bernier recommended to President Falcone that such a limited term arrangement would be beneficial to the College. Upon President Falcone's approval, Ms. Zimbelman was subsequently provided a one-year, limited term appointment as an adjunct research instructor in the Department of Health Sciences (Physical Therapy Program). Ms. Zimbelman left the College at the expiration of the one-year appointment.

## ANALYSIS

### Title VII

The plaintiff contends that she was denied tenure and retaliated against on account of her sex and pregnancy in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.. The defendant asserts that the plaintiff cannot demonstrate that it denied her tenure because of her sex. For the purposes of this motion, the defendant does not challenge the plaintiff's ability to make out a prima facie case of sex discrimination. Rather, the defendant asserts that the plaintiff cannot rebut the legitimate, nondiscriminatory reasons for the tenure denial.

In response, the plaintiff asserts that she has produced extensive evidence from which a reasonable jury could find that she was denied tenure because of her sex. Specifically, the plaintiff asserts that the evidence underlying her prima facie case supports a strong inference of discriminatory motivation and that the manner and timing of the defendant's pointed proposals that the plaintiff forego tenure for a non-tenured position support a strong inference that the defendant relied on a persistent sex stereotype disfavoring woman with families and

- 51 -

children.[3] Finally, the plaintiff asserts that her affirmative circumstantial evidence is reinforced by the extensive evidence that the defendant's proffered reason for choosing her for tenure denial is pretextual and unworthy of credence.

Title VII of the United States Code makes it unlawful for an employer to ". . . discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act amended Title VII of the Civil Rights Act to clarify that pregnancy discrimination is included in Title VII's prohibition on sex discrimination. Clay v. Holy Cross Hospital, 253 F.3d 1000, 1005 (7th Cir. 2001).

A plaintiff in a discrimination case may prove intentional discrimination by using either the "direct method" or the "indirect method." See Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004). "Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). The evidence may be direct or circumstantial. Rhodes, 359 F.3d at 504. However, a proffer of direct evidence must relate to the specific employment decision in question. Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997).

---

[3]The court notes that the plaintiff asserts that the defendant did not raise the possibility of taking a non-tenured job equally among the three chemistry candidates. The plaintiff specifically points to the meeting she had with Dr. Bernier on December 2, 2002. The undisputed facts fail to support her assertion. There is no indication in the undisputed facts that the plaintiff and Dr. Bernier discussed the plaintiff taking the non-tenure position at that meeting. The facts before the court show that that the plaintiff requested the meeting without indicating its purpose and started the meeting by announcing her pregnancy.

The indirect method requires that the plaintiff apply the burden-shifting method outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); see also, Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994). Initially, the burden is on the plaintiff to establish a prima facie case of discrimination.

In this case, the plaintiff relies on the indirect method of proof. Under this indirect method of proof, to establish a prima facie case of discrimination, the plaintiff must show: 1) that she belongs to a protected group; 2) that she performed the job satisfactorily; 3) that she suffered an adverse employment action; and 4) that the employer treated similarly situated employees outside the protected group more favorably. Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc., 210 F.3d 750, 752 (7th Cir. 2000) (citing Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 289 [7th Cir. 1999]). If the plaintiff establishes all the elements of a prima facie case, the plaintiff raises an inference of discrimination. See Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1132 (7th Cir. 1994).

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment decision. Finally, if the defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason was pretextual. See Kirk, 22 F.3d at 138. The plaintiff may prove pretext directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for the adverse employment action] is unworthy of credence." Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1303 (7th Cir. 1991) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 [1981]).

For purposes of this motion, the defendant concedes that the plaintiff had established a prima facie case of sex discrimination pursuant to the indirect method of proof. See McDonnell Douglas Corp., 411 U.S. 792. The defendant asserts, however, that it had a legitimate, nondiscriminatory reason for denying tenure to the plaintiff and that the plaintiff cannot demonstrate that the legitimate, nondiscriminatory reason was pretextual.

The court first will consider whether the defendant has proffered a legitimate, nondiscriminatory reason for denying the plaintiff tenure. "At this stage, the employer is not required to 'prove that it was actually motivated by the proffered reason. Rather, an employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" Rudin v. Lincoln Land Community College, 420 F.3d 712, 725 (7th Cir. 2005) (quoting Stockett v. Muncie Indiana Transit System, 221 F.3d 997, 1001 [7th Cir. 2000]).

The defendant asserts that President Falcone decided in late 2001 that the College could not support a fully tenured Chemistry Department and, therefore, he would recommend that one of the three tenure-track positions remain open. As a result, Dr. Bernier, Vice-President for Academic Affairs, and President Falcone recommended that tenure be denied to the plaintiff.

The undisputed facts establish that in late 2001, President Falcone reviewed the staffing in the Chemistry Department. At that time, one of the Chemistry Department's four assigned tenure tracks already was held by a tenured faculty member. The three remaining tenure-track positions were filled by non-tenured faculty who were scheduled to be considered for tenure in the next two years. President Falcone recognized that if all three non-tenured faculty received tenure, the Chemistry Department would be "tenured in". President Falcone

- 54 -

believed that the continued success of the College depended on its ability to respond to ever-changing student preferences through program diversification.

According to the undisputed facts, President Falcone determined that the Chemistry Department's enrollment was driven by service courses to the health sciences programs, such as nursing. He determined that these programs were volatile, due to historically cyclical enrollment and the potential for future, increased competition from other institutions. Thus, in late 2001, President Falcone decided that the College could not support a fully tenured Chemistry Department and, as a result, he would recommend that one of the three tenure-track positions not be filled. Subsequently, the Chemistry Department and faculty leadership was advised that only two of the three remaining tenure-track faculty would likely receive tenure. The desire to maintain staffing flexibility ultimately led Dr. Bernier and President Falcone to recommend, under the broad rubric of "institutional" need, against granting tenure to the plaintiff.

The undisputed facts further establish that the plaintiff was the only one who taught the introductory service courses to nursing students that Dr. Bernier believed had uncertain long-term enrollment. The undisputed facts also show that the College denied the plaintiff tenure, rather than the two other non-tenured faculty, both of whom are men, because of the types of courses taught by the plaintiff and their uncertain future.

Finally, the undisputed facts show that Dr. Bernier asked the Chemistry Department Chair, Dr. Schuder, to give his opinion on which of the three positions would be easiest to staff with faculty not on a tenure track. Dr. Schuder advised Dr. Bernier that he thought the College would have an easier time finding someone not on a tenure track to teach biochemistry, a course taught by the plaintiff. He also advised her that he thought it would be harder to find

someone to handle the teaching functions served by Dr. Piatt, which crossed departmental lines, and by Dr. Kevin McMahon, which included both organic chemistry and forensic science. Thus, Dr. Bernier determined that the College would retain the greatest degree of staffing flexibility by granting tenure to Dr. Piatt and Dr. Kevin McMahon and by denying tenure to the plaintiff.

Dr. Bernier subsequently conveyed her recommendations to President Falcone who, in turn, conveyed them along with his own recommendations to the College's Board of Trustees. The court concludes, based on the undisputed facts, that the defendant sufficiently produced "admissible evidence which would allow the trier of fact to conclude that the employment decision had not been motivated by discriminatory animus." See Rudin, 420 F.3d at 725.

The court now must consider whether the plaintiff has demonstrated that the defendant's legitimate, non-discriminatory reason was pretextual. The plaintiff points to the following as evidence that the defendant lied about its reason for denying her tenure. She asserts that she was overwhelmingly well qualified and that she alone had successfully started an important and growing new major and was essential to its continued progress (e.g., she alone was equipped to teach courses in that major, as well as a broader array of other courses in the department generally and in the expanding health sciences programs). She also points out that the enrollments in her areas of specialization outstripped those of her male colleagues.

The plaintiff further maintains that she taught in more academic program areas and taught a greater load of course hours than either Dr. Piatt or her husband, Dr. Kevin McMahon. The plaintiff concludes that "the simple fact that defendant nevertheless rejected

- 56 -

plaintiff in the face of these high and undisputed qualifications, and gave tenured positions instead to two men, sets up an unusually strong inference that her sex was a substantial cause of this rejection." (Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment [Plaintiff's Brief] at 25-26).

At the summary judgment stage, the plaintiff must show that there is a genuine issue as to whether the defendant honestly believed its stated reason for denying her tenure. Rudin, 420 F.3d at 725. Stated another way, "in order to survive summary judgment, an employee need only 'produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [her] dismissal.'" Weisbrot v. Medical College of Wisconsin, 79 F.3d 677, 682 (7th Cir. 1996). Therefore, "'if there is a question of fact as to the believability of an employer's purported reasons for an employment decision, then 'even if the evidence presented by [the plaintiff] does not compel the conclusion that [her employer] discriminated against [her] when making its . . . decision, at a bare minimum it suffices to defeat [the employer's] summary judgment motion.'" Rudin, 420 F.3d at 726 (quoting Courtney v. Biosound, Inc., 42 F.3d 414, 423 [7th Cir. 1994]). However, "[t]he pretext inquiry focuses on whether the employer's reason was honest, not whether it was accurate." Rudin 420 F.3d at 727 (quoting Helland v. South Bend Community School Corp., 93 F.3d 327, 330 [7th Cir. 1996]).

The plaintiff maintains that although Dr. Schuder and Dr. Bernier had discussions with her, Dr. Piatt and Dr. Kevin McMahon concerning the non-tenure-track position, the defendant did not raise the possibility of taking a non-tenured job equally among the three chemistry candidates. The undisputed facts show that in December 2001, Dr. Schuder communicated to the plaintiff, Dr. Kevin McMahon and Dr. Piatt that President Falcone had said it was

unlikely that all three would receive tenure. According to Dr. Schuder, President Falcone did not want to fully tenure the Chemistry Department. At that time, Dr. Schuder told the three faculty members that if any one of them wanted to move directly into a non-tenure-track position, he or she could do so and the position would be given to that person.

The undisputed facts also establish that Dr. Schuder supported the plaintiff. For, example, on October 25, 2001, Dr. Schuder wrote: "Charlene worked very hard this past year to build a biochemistry major and was, of course, successful. Her leadership of this program is very much needed in the future. She is also working hard with undergraduate students initiating some research projects. Overall, I feel that Charlene represents an important part of the Chemistry Department and I certainly feel that she will be needed in the future." At the plaintiff's biennial review in April 2002, Dr. Schuder "emphatically state(d) that Charlene should be tenured and had the skills to become the department's chair."

In August 2002, Dr. Schuder again met with all three non-tenured faculty in the Chemistry Department – the plaintiff, Dr. Kevin McMahon and Dr. Piatt. At the meeting he indicated that if one person wanted to step into a non-tenure-track position, the remaining two would likely get tenure.

The plaintiff argues that Dr. Schuder's manner and behavior at one meeting and his references to "family life," "lesser time commitments" and "greater flexibility" and Dr. Bernier's "demeanor" in her discussion of the non-tenure track position after the plaintiff announced her pregnancy in December 2002, suggested that they thought she should take the non-tenure track position.[4] However, it is undisputed that no one in the administration ever suggested to

_____

[4]These assertions are not included in the undisputed facts either because they are disputed or are impressions, not factual propositions

- 58 -

the plaintiff that she should opt for the non-tenure-track position. In fact, Dr. Schuder advocated strenuously in support of the plaintiff receiving tenure.

Moreover, comments "based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. [The plaintiff] must show that the employer actually relied on gender in making the decision." Bruno v City of Crown Point, Ind., 950 F.2d 355, 362 (7th Cir. 1991). In this case, the plaintiff has failed to establish that comments based on sex stereotyping were even made, let alone that the defendant relied on gender in making the decision to deny her tenure.

The plaintiff maintains that the defendant provided shifting and inconsistent explanations for its failure to grant her tenure. She asserts that Dr. Schuder's statement that her courses would be easier to staff with non-tenure-track faculty was not mentioned by Dr. Bernier in her written recommendation, nor mentioned by Dr. Bernier when she met with the Faculty and Staff Concerns Committee or with the plaintiff. The plaintiff states that in each situation, Dr. Bernier gave no reason for the plaintiff's differential treatment.

A review of the undisputed facts does not indicate that the College gave shifting or inconsistent explanations of the reasons for its actions. The College has consistently maintained that it denied tenure to the plaintiff based upon institutional need, not the plaintiff's individual merit. Although the defendant never mentioned Dr. Schuder's opinion on staffing,[5] his opinion focused on which of the three positions would be easiest to staff with non-tenured faculty. Dr. Schuder did not focus on the individual qualifications of the three candidates, but rather on the teaching positions themselves. Dr. Bernier verbally communicated Dr. Schuder's

---

[5]Dr. Schuder opined that he believed the College could most easily find a qualified person to teach biochemistry who was not on the tenure track.

opinion to President Falcone and President Falcone relied on it in determining which chemistry candidate would be denied tenure. The facts also establish that a candidate denied tenure is not usually told the reasons for that denial.

In April 2003, when the plaintiff questioned why she was denied tenure and asked Dr. Bernier "why me," Dr. Bernier stated that the Board took into account the demographic profile of the faculty in the department and that the Board attempts to maintain staffing and program flexibility. Dr. Bernier told the plaintiff that it was not a matter of the Board choosing her colleagues "over" her, but rather that the Board considered the need for a tenured faculty member in her position and field.

Contrary to the plaintiff's assertion, the undisputed facts do not show a shifting or inconsistent explanation for the College's decision to deny the plaintiff tenure. Dr. Schuder's statement merely provides further explanation for the defendant's stated position that it decided not to tenure the faculty member in the plaintiff's position and field. Thus, the court concludes that Dr. Schuder's opinion is not inconsistent, but provides additional support for the defendant's decision to deny the plaintiff tenure.

In addition, with respect to the plaintiff's pregnancy discrimination claim, the undisputed facts establish that the plaintiff requested a meeting with Dr. Bernier without indicating the purpose of that meeting. On December 2, 2002, the plaintiff met with Dr. Bernier and announced her pregnancy. Although Dr. Bernier knew of the plaintiff's pregnancy shortly before giving her recommendation to President Falcone, there is no evidence that either President Falcone or the Board of Trustees knew of the plaintiff's pregnancy at the time the tenure decision was made. Accordingly, the plaintiff cannot establish that she was denied tenure based on her pregnancy.

- 60 -

In sum, the defendant has set forth a legitimate, nondiscriminatory reason for its decision to deny tenure to the plaintiff. The plaintiff has not established that the defendant's reason was pretextual. Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's Title VII discrimination claims will be granted.

**Retaliation**

The plaintiff's retaliation claim centers on the College's decision to deny her a non-tenured faculty position. The defendant maintains that the plaintiff does not have a "direct" case of retaliation. The defendant asserts that an employer cannot have retaliated against an employee if it made the contested decision before the protected activity occurred. The defendant also asserts that the plaintiff cannot make out a viable retaliation claim using the indirect route. Specifically, the defendant asserts that the plaintiff cannot demonstrate that a similarly situated individual who did not complain of sex discrimination was reemployed by the College. Finally, the defendant asserts that the plaintiff cannot establish pretext with respect to the defendant's legitimate nonretaliatory reason for refusing to consider her for re-employment.

In response, the plaintiff contends that she has provided extensive evidence from which a reasonable jury could find that she was denied a non-tenured faculty position in retaliation for her complaints of sex discrimination in her rejection for tenure. The plaintiff asserts that she has proven retaliation under the direct method of proof using both direct evidence and circumstantial evidence. The plaintiff also asserts that she establishes an unlawful retaliation under the indirect method.

Establishing a <u>prima facie</u> case of retaliation in violation of Title VII is similar to establishing a <u>prima facie</u> case of discrimination in violation of Title VII. Thus, the plaintiff may

establish a prima facie case of retaliation either through the "direct method" or the "indirect method." See Racicot v. Wal-Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005); Rhodes, 359 F.3d at 504.  Under the direct method, the plaintiff must present direct evidence of: 1) a statutorily protected activity; 2) an adverse action taken by the employer; and 3) a causal connection between the two.  Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002).  Under the indirect method, the plaintiff must show that: 1) she engaged in a statutorily protected activity; 2) she performed her job according to her employer's legitimate expectations; 3) despite her satisfactory job performance, she suffered an adverse action from the employer; and 4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  Buie v. Quad Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004); Stone, 281 F.3d at 644.

In this case, the first two elements of the direct method, namely that the plaintiff was engaged in a statutorily protected activity and that she suffered an adverse action by her employer, are not at issue.  To establish the third element, a causal connection, the plaintiff sets forth a statement made to Professor Schuder.  The plaintiff maintains that the statement is direct evidence of a causal link between her complaints of discrimination regarding her tenure denial and the defendant's refusal to consider her for the non-tenured position.  According to the plaintiff, Dr. Schuder told her that Dr. Bernier had advised him that the College was not going to consider the plaintiff for a non-tenured position because of her complaints of discrimination.  As evidence of this statement, the plaintiff cites her affidavit and Dr. Schuder's deposition testimony.

Dr. Schuder testified that the plaintiff told him that she received notice that she would not be given the non-tenure-track position.  Dr. Schuder could not remember whether he was

- 62 -

told by Dr. Bernier or told by the plaintiff after she had received notice that the plaintiff would not be given the non-tenure-track position. Dr. Schuder further testified that when he and Dr. Bernier discussed the non-tenure-track position shortly after the tenure denial decisions were made in the spring of 2003, Dr. Bernier did not suggest that one of the reasons the plaintiff would not be considered for the position was because she had complained of discrimination. Specifically, the deposition transcript states as follows:

> Q    Did Dr. Bernier ever suggest to you that one of the reasons Dr. McMahon would not be considered for the position was that she had complained of discrimination?
>
> A    Not – not when we were talking about it shortly after those tenure decisions were made and we were – and we were – and she was letting me know how the position would be filled in the future. No.

(Schuder Dep. at 68).

Dr. Schuder was then asked whether Dr. Bernier told him at some subsequent time that the plaintiff's discrimination complaint was the reason why she would not be considered for the position. Dr. Schuder testified: "My recollection of that is that I was told that [the plaintiff would not be considered for the position] because she was in process of – of filing a suit against the college and the college didn't have any need to consider her application."[6] Id. at 69. Dr. Schuder said that he was not sure who made the statement. When he was asked who were the "likely candidates" to have made the statement, he responded, over objection: "It would have most likely been either Dr. Bernier or Dr. Beth Towell." Id. Thus, even if Dr.

---

[6]The defendant maintains that the statement that the College did not have any need to consider the plaintiff's application was made after the plaintiff submitted an application in the fall of 2003. This later application was the basis for a separate EEOC charge and is the subject of a second federal court complaint pending before United States District Judge Charles N. Clevert. The court is unable to ascertain by the citations given by the defendant whether the statement relates to the proceedings in this case or only to the proceedings in Judge Clevert's court.

- 63 -

Schuder's statement is admissible as an admission of a party opponent under Fed. R. Evid. 801(d)(2), the evidence does not establish that Dr. Bernier made the statement.

Moreover, in order to establish the necessary causal link between a plaintiff's statutorily protected activity and an adverse employment action, the decisionmaker must have had actual knowledge of a plaintiff's complaints at the time the decision was made. See e.g., Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004). In this case, the undisputed facts establish that before tenure recommendations were made in late 2002, President Falcone had made the decision not to employ any 2003 tenure candidates who might be denied tenure, post-tenure denial. President Falcone's decision not to re-employ the unsuccessful Chemistry Department tenure candidate, post-tenure denial, was made before the plaintiff made any complaint of discrimination and was based on the concept that a "terminal year" in a tenure process is "terminal." The facts before the court also establish that President Falcone alone made the decision not to reconsider the "no re-employment" rule for faculty members denied tenure in February 2003.

In addition to direct evidence of discrimination, the plaintiff also contends that there exists direct circumstantial evidence of retaliation. The court of appeals for this circuit explained that "there are three means by which a plaintiff can defeat summary judgment using circumstantial evidence under the direct method." Phelan v. Cook County, 463 F.3d 773, 781 (7th Cir. 2006); Yong-Qian Sun v. Bd. of Trustees of Univ. of Illinois, 473 F.3d 799, 812 (7th Cir. 2007). "The first is through the demonstration of 'suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" Phelan, 463 F.3d at 781 (quoting Rudin v. Lincoln Land Community College,

- 64 -

420 F.3d 712, 720-21 [7th Cir. 2005]). "The second is through evidence that a similarly situated employee received more favorable treatment, and the third is through 'evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief.'" <u>Phelan</u>, 463 F.3d at 781 (quoting <u>Rudin</u>, 420 F.3d at 720-21).

To prevail, however, the plaintiff must construct "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" <u>Rhodes</u>, 359 F.3d at 504 (quoting <u>Troupe v. May Dept. Stores Co.</u>, 20 F.3d 734, 737 [7th Cir. 2003]). Moreover, the circumstantial evidence "'must point directly to a discriminatory reason for the employer's action.'" <u>Rhodes</u>, 359 F.3d at 504 (quoting <u>Adams v. Wal-Mart Stores, Inc.</u>, 324 F.3d 935, 939 [7th Cir. 2003]).

The plaintiff contends that this case involves "suspicious timing." Specifically, the plaintiff points to an email exchange with Dr. Bernier. On February 24, 2003, the plaintiff emailed Dr. Bernier asking to discuss the non-tenure-track position. Dr. Schuder also contacted Dr. Bernier on the plaintiff's behalf to inquire about her continued employment. Dr. Bernier emailed the plaintiff and Dr. Schuder on February 26, 2003, stating: "[b]ecause of the current disarray on campus, I will not be able to give you an answer to your latest question. When we return to some semblance of normalcy, ask me again." Two days later the plaintiff made a formal sex discrimination complaint against the College. Then on April 9, 2003, Dr. Bernier advised the plaintiff that she would not be considered for a non-tenure-track position in the Chemistry Department because she had been denied tenure. Dr. Bernier indicated that to consider her for non-tenure-track employment would be against AAUP principles.

The plaintiff asserts that the timing "of the flat rejection" three to four weeks after the College first knew of her protected activity supports a strong inference that the College's refusal to consider her for the non-tenured position was a direct result of her having accused the College of unlawful sex discrimination. Although there is a temporal relationship between the plaintiff's filing of her complaint and the denial of her request to be considered for the non-tenure-track position, such evidence, in and of itself, is not conclusive. Troupe, 20 F.3d at 737. Rather, a plaintiff must compose "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" Rhodes, 359 F.3d at 504 (quoting Troupe, 20 F.3d at 737). The plaintiff has not presented evidence from which an inference of discriminatory intent might be drawn. To the contrary, the evidence before the court establishes that the decisionmaker, President Falcone, decided not to hire in a non-tenured position any faculty member denied tenure in 2003. This decision was made in late 2001, before any tenure decisions were made and before the plaintiff filed her complaint.

The plaintiff also contends that a similarly situated employee, Janet Zimbelman, received more favorable treatment which evidences retaliation against her under the direct method. The plaintiff points out that Ms. Zimbelman was denied tenure during 2001-2002, but nonetheless, was given a limited appointment for the year following her terminal year.

However, the plaintiff has failed to establish that Ms. Zimbelman is similarly situated to her. The evidence establishes that Ms. Zimbelman, who was considered for tenure in 2002, was granted a one-year limited term appointment. She was given this appointment because the department chair requested it so that Ms. Zimbelman could act as a liaison between the College and the Medical College of Wisconsin to further develop shared research and scholarship opportunities between the two institutions.

- 66 -

Finally, the plaintiff asserts that the College rejected her application despite her qualifications and its reason for doing so is pretextual. There is no dispute that the plaintiff was well qualified for the position. However, the undisputed facts establish that the general rule in academia is that if a faculty member is denied tenure, he or she completes a terminal year of employment and then leaves the institution. The undisputed facts also establish that President Falcone decided in late 2001, that if a candidate presented himself or herself for tenure consideration and was denied tenure, that candidate would not thereafter be considered for a non-tenure-track position. There is no evidence that the College's reason for rejecting the plaintiff's application is pretextual.

In summary, the plaintiff has failed to present evidence to defeat the defendant's motion for summary judgment using circumstantial evidence under the direct method. The circumstantial evidence in this case just does not "point directly to a discriminatory reason for [the College's] action." See Rhodes, 359 F.3d at 504.

The plaintiff's retaliation claim also fails under the indirect approach. The plaintiff has not established that she and not any similarly situated employee who did not engage in protected activity was subject to an adverse employment action. The undisputed facts establish that Dr. Heim never made a complaint of sex discrimination or discrimination based on any other protected characteristic to the College. Nevertheless, although President Falcone was asked to consider re-employing Dr. Heim in a non-tenure-track position after he had been denied tenure in February 2003, President Falcone refused.[7]

---

[7]President Falcone also was asked to consider re-employing Dr. Johnson and De. Scovill in non-tenure-track positions after they had been denied tenure in 2003. In each case, he refused to do so.

- 67 -

Nonetheless, the plaintiff asserts that she need not show that all similarly situated employees were treated more favorably than she (which is how she portrays the defendant's argument), but that she need show only one or more similarly situated individuals who did not oppose discrimination and were more favorably treated. The plaintiff points to the cases of Janet Zimbelman and Rebecca Steffes. Rebecca Steffes was denied tenure in 1996. Subsequently, President Falcone approved continuing Ms. Steffes' employment in a part-time administrative position, a non-tenure-track position. Ms. Steffes was the circulation librarian, not a member of the teaching faculty. Although as a librarian she was eligible for tenure as contemplated by the Conditions of Employment, President Falcone believed that the position held by Ms. Steffes never should have been classified as tenure eligible in the first instance. Therefore, he made an exception to the general rule against re-employing faculty denied tenure.

With respect to Ms. Zimbelman, the undisputed facts establish that Ms. Zimbelman, who taught in the physical therapy program of the Health Sciences Department, was rehired after she was denied tenure. Although Ms. Zimbelman was denied tenure based upon the merit criteria, the department chair of the Health Sciences Department went to Dr. Bernier and raised the possibility of a limited term appointment for Ms. Zimbelman following her terminal year. A significant purpose of this limited term appointment, as presented by the department chair, was to allow Ms. Zimbelman to serve as a liaison between the College and the Medical College of Wisconsin in order to further develop shared research and scholarship opportunities between the two institutions. Dr. Bernier recommended to President Falcone that such a limited term arrangement would be beneficial to the College and based upon President Falcone's approval, Ms. Zimbelman was provided a one-year, limited term

- 68 -

appointment as an adjunct research instructor in the Department of Health Sciences (Physical Therapy Program).

The plaintiff has not established that either Ms. Zimbelman or Ms. Steffes was similarly situated to her. Accordingly, the fact that they were re-employed does not establish that the College would have re-employed the plaintiff in a non-tenure-track position had she not filed a discrimination complaint. Moreover, the facts establish that those who were similarly situated to the plaintiff were not reemployed. Therefore, the defendant's motion for summary judgment as to the plaintiff's claim of retaliation will be granted.

**Breach of Contract**

The defendant asserts that the plaintiff had no contractual right to tenure and thus, her breach of contract claim is subject to dismissal. Specifically, the defendant asserts that no contract exists at the College under which a faculty member is granted tenure if she completes certain prerequisites. Rather, the faculty member may be considered for tenure if she completes those prerequisites. The defendant further contends that the plaintiff was considered for tenure and, based on the institutional need for "flexibility," was denied tenure.

In response, the plaintiff asserts that regardless of the nature of an individual's employment (e.g., at will employment), Wisconsin law holds the employer responsible for whatever further contractual promises it has made to a prospective employee regarding other aspects of that employment. The plaintiff further asserts that at the same time that she was given her original one-year contract of employment, the College entered into a further written contract with her which was based on its Conditions of Employment.

According to the plaintiff, the written tenure-track contract promised the plaintiff that she would be reviewed for tenure according to specific, limited criteria and procedures and that

- 69 -

her review would be based on a deliberate and reasonable evaluation of available information. The plaintiff maintains that "institutional need" is not one of the specified criteria. Thus, by basing its decision not to tenure one of the chemistry candidates on "institutional need," the plaintiff asserts that the defendant breached its contract with her. The plaintiff further maintains that while the College could have used "institutional need" as grounds for not giving her a tenure-track position to start with, once the College had employed her under the terms of its Conditions of Employment, it could not deny her tenure based on "institutional need."

The parties disagree as to what breach of contract claim the plaintiff has pled in her amended complaint.[8] The defendant maintains that, as pled, the plaintiff's breach of contract claim is as follows: she met all of the criteria for tenure; she was denied tenure; therefore, her contract was breached. To resolve this disagreement, the court will set out the plaintiff's breach of contract claim. The plaintiff's complaint states in relevant part as follows:

> 9.     On or about February 22, 2003 plaintiff was denied tenure by agents of the college, including but not limited to the college board of trustees despite having met all the contractual requirements that entitled her to tenure and promotion to the position of Associate Professor.
> 10.    A letter written by Lynne L. Bernier, Ph.D., Vice-President of Academic Affairs in her capacity as agent for the defendant admitted that plaintiff met all of the requirements to merit tenure at the college. The defendant college's denial of tenure to plaintiff was a material breach of the defendant's implicit and explicit contractual obligations to plaintiff. The defendant's denial of tenure to plaintiff breached its duty of good faith and fair dealing to plaintiff.
> 11.    The breach of defendant's contractual obligations has caused the plaintiff substantial damage in terms of lost wages, lost career development, lost prestige within the academic community and future losses of wages which she is unlikely to recoup.

(Amended Complaint at 4).

---

[8] While this summary judgment motion was pending, the plaintiff filed a motion to file a second amended complaint. The court denied the plaintiff's motion in a written order filed August 25, 2006.

The plaintiff agrees that the defendant had wide discretion to evaluate her subjective academic merit. Contrary to the defendant's position, the plaintiff maintains that her claim is not that she "had any automatic 'promise' or 'guarantee' of tenure or that her tenure denial constituted a wrongful or 'bad-faith' 'termination' in breach of any contractual promise for continued *employment*, tenured or otherwise." (Plaintiff's Brief at 6). Rather, the plaintiff asserts that the breach of contract claim arises out of a contract that the College entered into with her based on its Conditions of Employment in which the College promised the plaintiff that she would be reviewed for tenure according to specific limited criteria and procedures. The plaintiff contends that the defendant breached the contract by basing her denial of tenure on criteria not permitted by the contract and that her pleading sufficiently encompasses such a claim.

The plaintiff's complaint alleges that she and the defendant entered into a contract. She further alleges that the defendant denied her tenure in violation of that contract.

Rule 8(a) of the Federal Rules of Civil Procedure requires that a pleading contain only "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . , (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." The court of appeals for this circuit has stated that "[t]his is a notice pleading standard, not a fact pleading standard." McDonald v. Household Intern., Inc., 425 F.3d 424, 427 (7th Cir. 2005). The plaintiff, thus, is not required to plead either facts or legal theories. Hefferman v. Bass, 467 F.3d 596, 599 (7th Cir. 2006).

In this case, contrary to the defendant's argument, the plaintiff sufficiently pleads a cause of action for breach of contract. Accordingly, the court will determine whether the

- 71 -

defendant is entitled to summary judgment on the plaintiff's breach of contract claim, that is, that the defendant entered into a contract with her based on its Conditions of Employment in which the defendant promised her that she would be reviewed for tenure according to specific, limited criteria and procedures. It is the plaintiff's position that the specific, limited criteria did not include "institutional need".

The terms and conditions of employment for tenured and tenure-track faculty are set forth in a contract between the faculty and the Board of Trustees entitled, "Conditions of Employment at Carroll College." The Conditions of Employment are part of the College's Faculty Manual, a document that also contains the College's Articles of Incorporation, its By-Laws, and its governance document and other documents.

Section III of the Conditions of Employment provides as follows:

Academic tenure means the contingent right of a faculty member appointed to a tenure position to retain that position until retirement. . .. The faculty member having attained tenure status may continue to serve unless adequate cause (See III-D) is shown for termination of employment.

(Falcone Decl., Exh. E, Conditions of Employment, § III A). A grant of tenure is further characterized as "a formal personnel action of the Board of Trustees acting on recommendations from the President of the College, who, in turn, will have reviewed and acted upon the recommendation of the [Chief Academic Officer] and of the Tenure and Promotion Committee." Id.

The Conditions of Employment provide:

The [Chief Academic Officer] reviews [the] recommendations [of the Tenure and Promotion Committee and the department chair], determines at this time in tenure cases whether there is a continuing need for the candidate's service, makes his/her own recommendation, and forwards all recommendations to the President . . ..

- 72 -

Id., Exh. E, Conditions of Employment, § IV.B.4.  The Conditions of Employment further provide:

> Tenure is not automatically granted at the end of any stated probationary period except in accordance with Sections I-C and I-D.  The procedures set forth herein are designed not only to make a decision mandatory at a specific time but also to insure a deliberate judgment based upon the needs of the instructional program of the College and a candidate's potential for contributing to those needs.

Id., Exh. E, Conditions of Employment, § IIIA).

Construction of a contract is a question of law.  Smith v. Katz, 226 Wis.2d 798, 806, 595 N.W.2d 345, 349 (Wis. 1999);.  In interpreting a contract, "[a] court may not depart from the plain meaning of a contract where it is free from ambiguity."  Hortman v. Otis Erecting Co., Inc., 108 Wis.2d 456, 461, 322 N.W.2d 482 (Wis. Ct. App.1982) (citation omitted).  Contractual language is ambiguous only when it is "reasonably or fairly susceptible of more than one construction."  Borchardt v. Wilk, 156 Wis.2d 420, 427, 456 N.W.2d 653 (Wis. Ct. App. 1990).  Unambiguous contractual language is enforced as written.  Dykstra v. Arthur G. McKee & Co., 92 Wis.2d 17, 38, 284 N.W.2nd 692 (Wis. Ct. App. 1979).

The plaintiff asserts that the Conditions of Employment specify only one criterion or condition for tenure and that is whether "there is a continuing need for the candidate's services." (Plaintiff's Brief at 9; Falcone Decl., Exh. E, Conditions of Employment § IIIA).  The Conditions of Employment do not define "continuing need."  Therefore, the court must assign the word its plain and ordinary meaning.  First Bank & Trust v. Firstar Information Services Corp., 276 F.3d 317, 323 (7th Cir. 2001).  To do so, the court may resort to a dictionary definition.  Id.

- 73 -

A continuing need is not, as the plaintiff asserts, a need that exists only in the present, i.e., at the time the tenure decision is made. According to Webster's Third International Dictionary, "continuing" is defined as "lasting," "enduring," "continuous," and "constant." Thus, a continuing need must both exist in the present and in the future. The contract provides that the decision to grant or deny tenure is "a deliberate judgment based upon the needs of the instructional program of the College and a candidate's potential for contributing to those needs." (Falcone Decl., Exh. E, Conditions of Employment § IV.B.4).

In this case, the undisputed facts establish that the defendant, specifically President Falcone, determined that the long-term future of health sciences was uncertain because of past volatility in the demand for nurses and the potential of increased competition among academic institutions vying for students interested in health-related professional programs. He concluded that because the demand for service courses in the Chemistry Department was directly related to the enrollment in the health-related professional programs, the Chemistry Department would not necessarily continue to require four faculty members. Therefore, the College did not want to make the long-term financial commitment that tenuring all three candidates would require.

President Falcone determined that one of the three non-tenured faculty members in the Chemistry Department would not receive tenure because there might not be a continuing need for four tenured faculty members in the Chemistry Department. Such a determination was not contrary to the terms of the Conditions of Employment. Accordingly, the defendant's motion for summary judgment as to the plaintiff's breach of contract claim will be granted.

- 74 -

**Retaliation / Breach of Contract**

Finally, the defendant asserts that the plaintiff has no viable claim for retaliation/breach of contract. The plaintiff did not respond to the defendant's motion for summary judgment as to this claim. Moreover, as asserted by the defendant, the plaintiff failed to identify the contractual provision which establishes the right to pursue due process remedies "without suffering retaliation for doing so." (Amended Complaint at ¶ 12). It is not the responsibility of this court "to research and construct the parties' arguments." See e.g. Spath v. Hayes Wheels Intern.-Indiana, Inc. 211 F.3d 392, 397 (7th Cir. 2000). Therefore, the petitioner has waived this claim. See Johnson v. McCaughtry, 92 F.3d 585, 595 n. 19 (7th Cir. 1996). Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's retaliation/breach of contract claim will be granted.

### ORDER

**NOW, THEREFORE, IT IS ORDERED** the defendant's motion for summary judgment be and hereby is **granted**. (Docket # 89).

**IT IS FURTHER ORDERED** that the case be **dismissed**.

**IT IS ALSO ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of March, 2007.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge

- 75 -